# FIELD *v.* CLARK.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF ILLINOIS.

## BOYD *v.* UNITED STATES.

## STERNBACH *v.* UNITED STATES.

APPEALS FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

Nos. 1052, 1049, 1050.  Argued November 30, December 1, 2, 1891. — Decided February 29, 1892.

The signing by the Speaker of the House of Representatives and by the President of the Senate, in open session, of an enrolled bill, is an official attestation by the two Houses of such bill as one that has passed Congress; and when the bill thus attested receives the approval of the President, and is deposited in the Department of State according to law, its authentication as a bill that has passed Congress is complete and unimpeachable.

It is not competent to show from the journals of either House of Congress, that an act so authenticated, approved and deposited, did not pass in the precise form in which it was signed by the presiding officers of the two Houses and approved by the President.

Congress cannot, under the Constitution, delegate its legislative power to the President.

The authority conferred upon the President by section 3 of the act of October 1, 1890, to reduce the revenue and equalize duties on imports, and for other purposes, 26 Stat. c. 1244, pp. 567, 612, to suspend by proclamation the free introduction of sugar, molasses, coffee, tea and hides, when he is satisfied that any country producing such articles imposes duties or other exactions upon the agricultural or other products of the United States, which he may deem to be reciprocally unequal or unreasonable, is, not open to the objection that it unconstitutionally transfers legislative power to the President, (FULLER, C. J., and LAMAR, J., dissenting;) but even if it were it does not follow that other parts of the act imposing duties upon imported articles, are inoperative.

The court does not decide whether the provision in that act respecting bounties upon sugar (schedule E, Sugar, 26 Stat. 583) is or is not constitutional, because it is plain from the act that these bounties do not constitute a part of the system of customs duties imposed by the act, and it is clear that the parts of the act imposing such duties would remain in force even if these bounties were held to be unconstitutionally imposed.

Unless it be impossible to avoid it, a general revenue statute should never be declared inoperative in all its parts because a particular part, relating to a distinct subject, may be invalid.

THESE were suits by importers to obtain a refund of duties claimed to have been illegally exacted on imported merchandise under the tariff act approved October 1, 1890, 26 Stat. 567, c. 1244.

Marshall Field & Co. proceeded against John M. Clark, the collector of the port of Chicago, to recover duties paid on woollen dress goods, woollen wearing apparel and silk embroideries.

Boyd, Sutton & Co. proceeded against the United States and J. B. Erhardt, collector of the port of New York, to recover duties paid upon an importation of silk and cotton laces.

H. Herman, Sternbach and Co. proceeded against the United States to recover duties paid upon colored cotton cloths.

The main issue in all the cases was, whether that act, which purports to repeal the previous tariff act of March 3, 1883, 22 Stat. 488, c. 121, had itself the force of law.

The facts which were presented in support of the contention that the bill never became a law in accordance with the provisions of the Constitution were three.

(1) That in engrossing the bill a clause known as section 30, relating to a rebate of taxes on tobacco, which was shown by the journals of both the House of Representatives and the Senate to have been regularly passed by both Houses of Congress, was omitted, and that the engrossed act, as attested by the Vice-President and the Speaker of the House, as approved by the President, and as deposited with the Secretary of State, was not the act which passed the two Houses of Congress, and was therefore not a statute of the United States in accordance with the provisions of the Constitution.

(2) That the first five paragraphs of Schedule E, section 1, of the act, providing for bounties to producers of American sugar (paragraphs 231 to 235), were unconstitutional and void, no power to enact legislation of this character having been vested in Congress by the Constitution.

(3) That section 3 of said act was unconstitutional and void, in that it delegates to the President the power of laying taxes and duties, which power, by sections 1 and 8 of article 1 of the Constitution, is vested in Congress.

As the court in its opinion, *post,* has set forth these several matters objected to at length, it is sufficient to refer to it for further details.

The judgment in each case in the court below was against the importer. In this court the three cases were argued together, but by separate counsel for the appellants in each case, each brief covering the whole case. In order not to go over the same ground three times, the arguments for appellants reported are: in No. 1052 on point (1); in No. 1049 on point (2); and in No. 1050 on point (3); that being the order in which the cases stand in the opinion of the court.

*Mr. N. W. Bliss* and *Mr. John P. Wilson* for Marshall Field & Co., appellants.

Where a bill, which passed both the House of Represent-

atives and the Senate, containing a clause which the Senate opposed, and receded from their opposition only after conference ordered, and which was engrossed and presented to and signed by the President, omitting the clause upon which the controversy between the two houses took place, it renders invalid not only the omitted section, but the entire act.

When a bill passed by one branch of the legislative body differs materially from the bill passed by the other branch, or when one branch wholly fails to pass it, or when the bill approved by the Executive is materially different from the bill passed by the two houses, it will be held to be a nullity. Cooley, Const. Lim. 6th ed. 183. This view of the law of the case at bar is sustained by the following cases: *Moody* v. *State*, 48 Alabama, 115; *State* v. *Mead*, 71 Missouri, 266; *Burritt* v. *Commissioners*, 120 Illinois, 322; *State* v. *Kiesewetter*, 45 Ohio St. 254; *Hunt* v. *State*, 22 Tex. App. 396; *Legg* v. *Annapolis*, 42 Maryland, 203; *Brady* v. *West*, 50 Mississippi, 68; *Larrison* v. *Railroad Co.*, 77 Illinois, 11; *Walnut* v. *Wade*, 103 U. S. 683; *Wenner* v. *Thornton*, 98 Illinois, 156; *Dow* v. *Beidelman*, 49 Arkansas, 325; *Smithee* v. *Campbell*, 41 Arkansas, 471; *Smithee* v. *Garth*, 33 Arkansas, 17; *Bound* v. *Wisconsin Central Railroad*, 45 Wisconsin, 543; *Meracle* v. *Down*, 64 Wisconsin, 323; *Wise* v. *Bigger*, 79 Virginia, 269; *People* v. *De Wolf*, 62 Illinois, 253; *Opinion of Justices*, 35 N. H. 579; *Moog* v. *Randolph*, 77 Alabama, 597; *Jones* v. *Hutchinson*, 43 Alabama, 721; *Sayre* v. *Pollard*, 77 Alabama, 608; *Stein* v. *Leeper*, 78 Alabama, 517; *State* v. *Liedtke*, 9 Nebraska, 462; *Berry* v. *Baltimore & Drum Point Railroad*, 41 Maryland, 446; *State* v. *Hagood*, 13 So. Car. 46.

In all these cases the decision was that the entire act is rendered void whenever there has been a material variance between the bill as passed and the bill as signed and approved. The same may be said of the whole list of cases decided with reference to their having an object or purpose not expressed in the title, under constitutions requiring that each bill have reference to but one subject, and more are included. In all such cases the entire acts have always been held void, and not merely the purpose unexpressed or the subject in excess, as

will appear in the following cases: *Callaghan* v. *Chipman,* 59 Michigan, 610; *Ragio* v. *State,* 86 Tennessee, 272; *Leach* v. *People,* 122 Illinois, 420; *People* v. *Beadle,* 60 Michigan, 22; *In re Blodgett,* 89 N. Y. 392; *Grover* v. *Ocean Grove Camp Meeting,* 45 N. J. Law (16 Vroom) 399; *State* v. *Barrett,* 27 Kansas, 213; *Madison County* v. *Baker,* 80 Indiana, 374.

Judge Cooley, after saying that " the bill as signed must be the same as it passed the two Houses," adds, that a clerical error that would not mislead may be overlooked, citing *People* v. *Onondaga,* 16 Michigan, 254, 256. In that case the law was passed by both Houses with a title authorizing the levying of a certain bounty tax. In engrossing it for the governor's approval by a clerical error the word *county* was substituted for *bounty* in the title; as by an inspection of the act itself which used the correct wording, the error was such as to correct itself, and no one could be *misled* by it, it was held not to invalidate the whole act, Cooley, J., saying, however: " I am not prepared to say that an act of the legislature can be valid which as engrossed for the signature of the governor would be void if passed by the legislature in that form. A law must have the concurrence of the three branches of the legislative department, and if it differs in an *essential particular* when presented to the governor for his signature from the bill as passed by the two Houses, there is difficulty in saying that it has been concurred in by all." See also *Prescott* v. *Canal Trustees,* 19 Illinois, 324; *Smith* v. *Hoyt,* 14 Wisconsin, 273.

These cases sufficiently indicate what Mr. Cooley means by a " clerical error that would not mislead." It cannot by any possibility refer to, or cover, the omission of a section, clause or proviso which is a material part of the act itself.

In the case at bar the omitted clause was an entire section of the original bill. It was such an important clause of the bill as to be the subject of contention between the two Houses. It was of such consequence that when found to have been omitted from the enrolled act it was enacted under a suspension of the rules at the succeeding session, as an independent law. Can it be possible, under the authorities cited, that the Board of General Appraisers were correct in holding in effect

that where a bill which is passed by the two Houses is in such different terms or varies so materially in substance and legal effect from that which is approved by the President, as in the case presented, there still exists such a legal and actual identity between the bill passed and the one approved as that the one approved acquires the force and validity of a constitutional enactment?

The act of October 1, 1890, was before the Board of Appraisers, and its constitutionality was challenged. If it was invalid for any reason, then the contention of appellants was correct, and the act of March 3, 1883, was in force. The act of October 1, 1890, largely increased the duties upon the goods of appellants, and imposed upon them greater burdens than were leviable under the act claimed by appellants to govern. With reference to the questions determining which law was in force, that creating the greater burdens, or that imposing the lesser tax, the Board of Appraisers was in serious doubt. The main question was, which burden was the citizen to bear, which tax to pay? What should have been the canon of construction in such a case? Justice Story in *United States* v. *Wigglesworth*, 2 Story, 373, says: "It is, I conceive, a general rule, in the interpretation of all statutes, levying taxes or duties upon subjects or citizens, not to extend their provisions by implication beyond the clear import of the language used, nor to enlarge their operations so as to embrace matter not specifically pointed out, although standing upon close analogy. In every case, therefore, of doubt, such statutes are construed most strongly against the government, and in favor of the subjects or citizens, because burdens are not to be imposed beyond what the statutes expressly and clearly import." See also Potter's Dwarris Stats. 235; *Tomkins* v. *Ashby*, 6 B. & C. 541; *Warrington* v. *Furbor*, 8 East, 242; *Gildart* v. *Gladstone*, 11 East, 675; *Kingston Dock Co.* v. *Browne*, 2 B. & Ad. 43; *Powers* v. *Barney*, 5 Blatchford, 203.

It is submitted that under the doctrines of the text books and decisions on this question, the moment a doubt was established as to which law governed, the former law, or the alleged law largely increasing duties, that moment should

have solved the doubt against the government, and in favor of the citizen who has the burden to bear, the money to pay: that the Board of Appraisers erred in affirming the decision of the collector of the port upholding an appraisement under an alleged act, largely increasing the burdens of taxation upon a citizen, when it was seriously in doubt whether the alleged act had been constitutionally enacted and become a valid law; which error was continued in the *pro forma* decision of the Circuit Court affirming the decision of the Board of Appraisers. See also *Gurr* v. *Scudds*, 11 Exch. 190; *Conroy* v. *Warren*, 3 Johns. Cas. 259; *S. C.* 2 Am. Dec. 156; *Wright* v. *Briggs*, 2 Hill, 77; *The Liverpool Hero*, 2 Gallison, 184; *Adams* v. *Bancroft*, 3 Sumner, 384; *Richardson* v. *Emswiler*, 14 La. Ann. 658; *Chase* v. *New York Central Railroad*, 26 N. Y. 352.

Nor can the omitted clause be held to be trivial. The House proposed the bill reducing the tax and, as a condition, consideration and compensation for such reduction, by a clause connected therewith and dependent thereon, provided for a rebate. The Senate struck out the condition, the House adhered to it, the Senate receded from its action, and the bill passed. Is it conceivable that the House would have passed the part of the section reducing the tax, without the rebate clause? They refused to do it. They intended that the execution of their act reducing the tax should be tempered by the rebate clause, and this became the intent of the act as passed by the two Houses. How then can the legislative intent in this regard be carried into effect, with this clause expunged? It seems too plain to argue that it cannot. It therefore comes directly within the principle that it is only when the remainder is capable of being executed in accordance with the apparent legislative intent, wholly independent of that which was rejected, that it is capable of being sustained.

In *Allen* v. *Louisiana*, 103 U. S. 80, 83, Chief Justice Waite said: "It is an elementary principle that the same statute may be in part constitutional and in part unconstitutional, and that if the parts are wholly independent of each other that which is constitutional may stand, while that which is unconstitu-

tional will be rejected. 'But' as was said by Chief Justice Shaw, in *Warren* v. *Mayor and Aldermen of Charlestown*, 2 Gray, 84, 'If they are so mutually connected with and dependent on each other as conditions, considerations or compensations for each other as to warrant a belief that the legislature intended them as a whole and that, if all could not be carried into effect, the legislature would not pass the residue independently, and some parts are unconstitutional, all the provisions which are thus dependent, conditional or connected must fall with them.' The point to be determined is, whether the unconstitutional provisions are so connected with the general scope of the law as to make it impossible if they are stricken out, to give effect to what appears to have been the intent of the legislature." The principle governing these decisions, as enunciated by Chief Justice Shaw in this case, has been universally cited with approval and followed. The application of it to the case at bar under the decisions quoted seems perfect. The same doctrine is held in *Eckhart* v. *State*, 5 West Va. 515; *Tillman* v. *Cocke*, 9 Baxter, 429; *Meyer* v. *Berlandi*, 39 Minnesota, 438; *State* v. *Sank County*, 62 Wisconsin, 376; *State* v. *Hanger*, 5 Arkansas, 412; *Thorne* v. *Cramer*, 15 Barb. 112; *Parker* v. *Commonwealth*, 6 Penn. St. 507; *S. C.* 47 Am. Dec. 480; *Meshmeier* v. *State*, 11 Indiana, 482; *Lathrop* v. *Mills*, 19 California, 513; *State* v. *Copeland*, 3 R. I. 33; *State* v. *Sinks*, 42 Ohio St. 345; *State* v. *Pugh*, 43 Ohio St. 98; *Rader* v. *Union Township*, 39 N. J. Law (10 Vroom) 509; *Flanagan* v. *Plainfield*, 44 N. J. Law (15 Vroom) 118; *W. U. Tel. Co.* v. *State*, 62 Texas, 630; *Childs* v. *Shower*, 18 Iowa, 261; *Union Pacific Railroad* v. *Atchison*, 28 Kansas, 453; *Moore* v. *New Orleans*, 32 La. Ann. 726.

*Mr. W. Wickham Smith* (with whom was *Mr. Charles Curie* on the brief) for Boyd, Sutton & Co., appellants.

Section 3 of the act commonly called the "reciprocity section" is unconstitutional because it is a delegation of legislative power to the executive. It delegates to the President the power to determine, as to the five articles therein specified: (1) From what countries they must pay duty; (2) When they

shall begin to pay it ; (3) How long they shall continue to pay it. The only point not left to his discretion is the amount to be paid. The Constitution, Art. 1, sec. 8, says: *The Congress* shall have power to lay and collect taxes, duties, imports and excises.

One of the settled maxims in constitutional law is that the power conferred upon the legislature to make laws cannot be delegated by that department to any other body or authority. Where the sovereign power of the State has located the authority there it must remain; and by the constitutional agency alone the laws must be made until the constitution itself is changed. Cooley Const. Lim. c. 11, p. 137.

It would seem that if there was any class of laws to which this principle should be strictly applied it is tax laws.; laws by which the government puts forth its strong arm to take the property of the citizen from him to apply to its own purposes, or, as in this act, to bounties. No power conferred upon the legislature should be more jealously guarded or more cautiously or more scrupulously exercised. Yet here we have a law which delegates to the President of the United States the power, by a mere stroke of his pen, to impose an onerous and burdensome tax on articles, all of which are the subject of daily consumption by the people of the whole country, some of which cannot be produced here, and none of which can be produced here in sufficient quantities to supply the people's needs. It delegates to him the power of determining when to tax them and how long to tax them. On these questions his judgment, wisdom and patriotism are substituted for that of the people's representatives.

It has been sought to defend this power on the ground that laws have frequently been passed to take effect upon the happening of a future event, and that such legislation has been pronounced constitutional. Without discussing the soundness of such judicial decisions, it is sufficient to say that such cases are not parallel to the one now under consideration. A law may take effect on the happening of a future event. An event is a *fact.* The question whether it has or has not happened is one which anybody can readily determine. No exercise of judgment or wisdom is necessary. It is a matter of simple

intelligence. All questions that involve judgment and discretion are passed upon by the legislature. But in the case of this law, none of such questions were passed upon by the Congress. They were all committed to the wisdom, discretion and patriotism of the President.

A case much relied on in support of this section is *The Brig Aurora* v. *The United States*, 7 Cranch, 382.

There are three reasons why this case should have little weight as an authority: (1) It was decided at a very early date, before the principles of constitutional government had received the consideration and discussion which they have since received: (2) The point does not seem to have been carefully considered. At any rate the bare conclusion is stated without any exposition of the principles involved, and with no statement of the reasons on which it is based. Such cases are seldom deemed entitled to be considered as authoritative except on the precise question involved: (3) The power delegated to the President by the act then under consideration was not a taxing power; but the determination of the question whether a European government had so modified its edicts as to cease to violate neutral commerce. While this involved a certain amount of judgment, it was not such an abdication of legislative functions as that in section 3 of the Tariff Act. The power there delegated to the President was almost a war power, conferred at a time when our relations with England and France were strained, and relating to a subject which two years later involved us in a war with England. The power now conferred upon the President is a taxing power conferred at a time when we are at peace with all the world. See *Thorne* v. *Cramer*, 15 Barb. 112; *S. C.* 47 Am. Dec. 480; *Rice* v. *Foster*, 4 Harrington (Del.) 479; *State* v. *Simons*, 32 Minnesota, 540; *Ex parte Wall*, 48 California, 279; *State* v. *Hudson County Commissioners*, 37 N. J. Law (8 Vroom) 12; *State* v. *Swisher*, 17 Texas, 441; *Clark* v. *Mobile*, 67 Alabama, 217; *Grim* v. *Weissenberg School District*, 57 Penn. St. 433; *S. C.* 98 Am. Dec. 237; *Brodhead* v. *Milwaukee*, 19 Wisconsin, 624; *State* v. *Weir*, 33 Iowa, 134; *Farnsworth Co.* v. *Lisbon*, 62 Maine, 451; *Willis* v. *Owen*, 43 Texas, 41.

We submit that a statute which delegates to the executive the discretion to determine when and for how long and on what portion of the importations of a particular article (according to the country of its growth or production) a tax shall be levied, according to his judgment and discretion as to the fairness and justice of it, fixing only the amount of such tax when levied, is an unconstitutional delegation of the taxing power.

The incorporation in this act of the unconstitutional delegation of the taxing power in section 3, renders the whole act void.

This section relates to the same subject matter as the main portion of the bill, viz.: taxes on imports. It is an essential part of the scheme contemplated by said act. It was certainly one of the conditions and compensations for various other parts of the bill, for it recites substantially that the free introduction into the United States of sugar, molasses, coffee, tea and hides was enacted with a view to securing reciprocal trade with countries producing those articles and for that purpose.

Can the court believe that Congress would have passed this act without this section? The answer is, Congress refused to do so. This section was not in the bill as it passed the House. It was incorporated as an amendment by the Senate. The House refused to concur in the amendment. The Senate insisted on it. The Conference Committee of the two Houses retained it with an amendment simply as to the time of its taking effect. How then can it be said as matter of law that the act would have been passed without it? It is a matter of public knowledge that it was regarded at the time, and has been since, as one of the vital parts of the bill.

*Mr. Edwin B. Smith* and *Mr. Stephen G. Clarke* for H. Herman Sternback & Co., appellants.

Application of the principles and decisions of this court to the provisions found in paragraphs 231 to 236 of Schedule E of this act, giving a bounty to the producers of native sugar, manifest their unconstitutionality. Certainly, there is no more constitutional authority for paying men to tap a maple

and boil its sap, or to raise cane, than there is to raise hay, potatoes, corn or cabbage. If the taxes constituting the funds in the national treasury can be collected and disbursed to compensate a man for making sugar, they can be for making brick or any other manufacture. There can be, in such case, no limit to the extent to which moneys raised by taxation can be appropriated to the individual benefit of preferred citizens, and in the encouragement of their private enterprises and to their personal gain. *Loan Association* v. *Topeka*, 20 Wall. 655; *Jarrolt* v. *Moberly*, 103 U. S. 580; *United States* v. *New Orleans*, 98 U. S. 381; *Ralls County* v. *United States*, 105 U. S. 733; *Parkersburg* v. *Brown*, 106 U. S. 487; *Cole* v. *La Grange*, 113 U. S. 1.

Wherever state courts have had occasion to pass upon this question, it has been answered in the same way. *Allen* v. *Jay*, 60 Maine, 124; *Hooper* v. *Emery*, 14 Maine, 375; *Weismer* v. *Douglas*, 64 N. Y. 91; *Brewer Brick Co.* v. *Brewer*, 62 Maine, 62; *Farnsworth Co.* v. *Lisbon*, 62 Maine, 451; *Ohio Valley Iron Works* v. *Moundsville*, 11 West Virginia, 1; *Trustees Channel Co.* v. *Central Pacific Railroad*, 51 California, 269; *Curtis* v. *Whipple*, 24 Wisconsin, 350; *Bissell* v. *Kankakee*, 64 Illinois, 248; *State* v. *Osawkee*, 14 Kansas, 418; *State* v. *Nemaha Co.*, 7 Kansas, 542; *McConnell* v. *Hamm*, 16 Kansas, 228; *State* v. *Foley*, 30 Minnesota, 350.

The relation between the government and the citizen, *as a tax-payer*, is that the latter's property is, *pro tanto*, taken for the *direct* support of the former — not for the benefit of any fellow-citizens individually. *Pray* v. *Northern Liberties*, 31 Penn. St. 69; *Sharpless* v. *Mayor*, 21 Penn. St. 147; *S. C.* 59 Am. Dec. 759; *In re Mayor*, 11 Johns. 77; *Wynehamer* v. *People*, 13 N. Y. 375.

Many cases besides those above cited treat such legislation as void, because a violation of natural right, independent of constitutions. *Calder* v. *Bull*, 3 Dall. 386: *Wilkinson* v. *Leland*, 2 Pet. 627; *Osborn* v. *Nicholson*, 13 Wall. 654; *Gunn* v. *Barry*, 15 Wall. 610; *Bartemeyer* v. *Iowa*, 18 Wall. 129.

The connection of parts in this statute is such that the avoidance of any material provision which received executive approval must nullify the whole.

It is a substitute for Title XXXIII of the Revised Statutes, as the act of 1883 is wholly superseded thereby.

It constitutes one connected system, arranged with relation to its several parts; constituting a statutory embodiment of what is known in English legislative parlance as the budget; or the result of an examination made to determine the amount of estimated revenues, needed to meet estimated requirements.

There is a mutual relation and interdependence between the duties upon woollen goods and upon wool; between the bounty upon domestic sugar and the placing of foreign upon the free list, and the latter's conditional subjection to duty, at the will of the President.

*Mr. Attorney General* and *Mr. Solicitor General* for appellees. To the Government's brief was attached an appendix containing a list of the authorities, by States, upon the question whether the legislative journals could be used to impeach the completely enrolled act, duly recorded and authenticated. This list is printed in the margin.[1]

---

[1] *Alabama.* — In Alabama it is held that the validity of the seeming acts may be inquired into, and the presumption from due enrolment overthrown by the journals. *Dew* v. *Cunningham,* 28 Ala. 466; *Jones* v. *Hutchinson*, 43 Ala. 721; *Moody* v. *The State*, 48 Ala. 115; *State* v. *Buckley*, 54 Ala. 599; *Harrison* v. *Gordy*, 57 Ala. 49; *Perry County* v. *Railroad Co.*, 58 Ala. 546; *Walker* v. *Griffith*, 60 Ala. 361; *Moog* v. *Randolph*, 77 Ala. 597; *Sayre* v. *Pollard*, 77 Ala. 608: *Abernathy* v. *The State,* 78 Ala. 411; *Stein* v. *Leeper*, 78 Ala. 517; *Hall* v. *Steele*, 82 Ala. 562.

*Arkansas.* — In Arkansas the journals control the enrolled act. *Burr* v. *Ross*, 19 Ark. 250; *Vinsant* v. *Knox*, 27 Ark. 266; *English* v. *Oliver*, 28 Ark. 317; *State* v. *Little Rock & Texas Railway*, 31 Ark. 701; *Worthen* v. *Badgett*, 32 Ark. 496; *Smithee* v. *Garth*, 33 Ark. 17; *State* v. *Crawford*, 35 Ark. 237; *Chicot County* v. *Davies*, 40 Ark. 200; *Smithee* v. *Campbell*, 41 Ark. 471; *Webster* v. *Little Rock*, 44 Ark. 536; *Davis* v. *Gaines*, 48 Ark. 370; *Dow* v. *Beidelman*, 49 Ark. 325; *Glidewell* v. *Martin*, 51 Ark. 559.

It is noticeable that in the last case and in two previous cases, the judges delivering the opinions intimate a wish that the English rule were in force.

*California.* — In California the rulings have been various.

In *Fowler* v. *Peirce*, 2 Cal. 165, the court permitted oral evidence to be introduced to show that an act was approved by the governor after adjournment. This case was overruled in *Sherman* v. *Story*, 30 Cal. 253, where it was held that the enrolled act could not be impeached by the journals.

MR. JUSTICE HARLAN delivered the opinion of the court.

Duties were assessed and collected, according to the rates established by what is known as the Tariff Act of October 1,

This was followed in *People* v. *Burt*, 43 Cal. 560. After these two cases were decided a new constitution was adopted in California, under which the journals have been examined to impeach the enrolled bill. *County of San Mateo* v. *So. Pac. Railroad*, 8 Sawyer, 238; *Weill* v. *Kenfield*, 54 Cal. 111; *Oakland Paving Co.* v. *Hilton*, 69 Cal. 479; *People* v. *Dunn*, 80 Cal. 211.

*Colorado.* — In Colorado the journals control the enrolled act. *In re Roberts*, 5 Col. 525; *Hughes* v. *Felton*, 11 Col. 489.

*Connecticut.* — In Connecticut the journals cannot be used to impeach the recorded act. *Eld* v. *Gorham*, 20 Conn. 8.

*Dakota Territory.* — In *Dakota Territory ex rel.* v. *O'Connor*, 5 Dak. 397, it was held that the certificate of the presiding officers to the passage of the bill would not be overthrown by the mere silence of the journals. The question of a conflict between the enrolled act and the journals was not considered.

*Delaware.* — We have found no cases in this State in which the question is raised.

*Florida.* — In this State the journal may be resorted to to impeach the enrolled act. *State* v. *Brown*, 20 Fla. 407; *State* v. *Deal*, 24 Fla. 293.

*Georgia.* — So far as our examination has extended, there are no cases on the subject in Georgia.

*Idaho.* — No cases found on the subject.

*Illinois.* — In this State the journals control in any conflict between them and the enrolled act as to the validity thereof. *Spangler* v. *Jacoby*, 14 Ill. 297; *Turley* v. *Logan County*, 17 Ill. 151; *People* v. *Hatch*, 19 Ill. 283; *Prescott* v. *Ill. & Mich. Canal Trustees*, 19 Ill. 324; *Schuyler County* v. *People ex rel.*, 25 Ill. 181; *People* v. *Starne*, 35 Ill. 121; *Wabash &c. Railroad* v. *Hughes*, 38 Ill. 174; *Illinois Central Railroad* v. *Wren*, 43 Ill. 77; *Bedard* v. *Hall*, 44 Ill. 91; *Grob* v. *Cushman*, 45 Ill. 119; *People* v. *DeWolf*, 62 Ill. 253; *Hensoldt* v. *Petersburg*, 63 Ill. 157; *Ryan* v. *Lynch*, 68 Ill. 160; *Happel* v. *Brethauer*, 70 Ill. 166; *Miller* v. *Goodwin*, 70 Ill. 659; *Plummer* v. *The People*, 74 Ill. 361; *Larrison* v. *Peoria &c. Railroad Co.*, 77 Ill. 11; *Binz* v. *Weber*, 81 Ill. 288; *People* v. *Loewenthal*, 93 Ill. 191; *Wenner* v. *Thornton*, 98 Ill. 156; *Burritt* v. *Commissioners of State Contracts*, 120 Ill. 332; *Leach* v. *The People*, 122 Ill. 420; *South Ottawa* v. *Perkins*, 94 U. S. 260; *Walnut* v. *Wade*, 103 U. S. 683; *Ohio* v. *Frank*, 103 U. S. 697; *Post* v. *Supervisors*, 105 U. S. 667.

*Indiana.* — In Indiana now, the journals do not control the enrolled act. Formerly they were consulted for the purpose of impeaching the act. The journals were referred to in *Skinner* v. *Deming*, 2 Ind. 558; *Coleman* v. *Dobbins*, 8 Ind. 156; *McCulloch* v. *The State*, 11 Ind. 424; *Coburn* v. *Dodd*, 14 Ind. 347.

The rule was changed and the enrolled act held conclusive of its valid

1890, on woollen dress goods, woollen wearing apparel and
silk embroideries, imported by Marshall Field & Co. ; on silk

passage. *Evans* v. *Browne,* 30 Ind. 514; *Bender* v. *The State,* 53 Ind. 254;
*Edger* v. *Board of Commissioners of Randolph County,* 70 Ind. 331; *State* v.
*Denny,* 21 N. E. Rep. 252.

*Iowa.*— In Iowa the enrolled act in the Secretary of State's office is held
to be the ultimate proof of the law. *Clare* v. *The State,* 5 Iowa, 510; *Dun-
combe* v. *Prindle,* 12 Iowa, 1.

Where the validity of a constitutional amendment was in question, as
different provisions of the constitution applied, it was held that the jour-
nals could be consulted. *Koehler & Lange* v. *Hill,* 60 Iowa, 543.

*Kansas.*— In Kansas the enrolled act is controlled by the journals. *Haynes*
v. *Heller,* 12 Kans. 384, Reporter's note; *Division of Howard County,* 15 Kans.
194; *Leavenworth County Commissioners* v. *Higginbotham,* 17 Kans. 62; *Prohibitory
Amendment Cases,* 24 Kans. 700; *State* v. *Francis,* 26 Kans. 724; *In re Vander-
berg,* 28 Kans. 243; *Weyand* v. *Stover,* 35 Kans. 545; *Kansas* v. *Robertson,* 41
Kans. 200.

*Kentucky.*— In Kentucky the question has not been squarely decided
whether the journals in a conflict would overcome the presumption of the
enrolled act, but the intimations of the court are that it would. *Common-
wealth* v. *Jackson,* 5 Bush, 680; *Auditor* v. *Haycroft,* 14 Bush, 284.

*Louisiana.*— In this State it is held that the enrolled act is conclusive.
*The Louisiana State Lottery Co.* v. *Richoux,* 23 La. Ann. 743; *Whited* v. *Lewis,* 25
La. Ann. 568. ,

*Maine.* — In this State the enrolled act is held to be the best evidence,
and not to be overcome by the journals where its record is complete. *Weeks*
v. *Smith,* 81 Me. 538.

*Maryland.* — In this State the enrolled act was at first held to be conclu-
sive. Afterwards the decisions are that it may be impeached by the jour-
nals. The first series of cases is : *Fouke* v. *Fleming,* 13 Md. 392; *Mayor etc.
of Annapolis* v. *Harwood,* 32 Md. 471.

Under a new constitution the following cases held that the enrolled act
might be impeached by the journals and other evidence : *Berry* v. *Baltimore
& Drum Point Railroad,* 41 Md. 446; *Legg* v. *Annapolis,* 42 Md. 203; *Strauss*
v. *Heiss,* 48 Md. 292.

*Massachusetts.*— In this State no cases have been found bearing on the
subject.

*Michigan.* — In this State the enrolled act is controlled by the entries on
the journals. *Southworth* v. *Palmyra & Jackson Railroad,* 2 Gibbs, 287; *Green*
v. *Graves,* 1 Douglass, 351; *Hurlbut* v. *Britain,* 2 Douglass, 191; *People* v.
*Mahaney,* 13 Mich. 481; *People* v. *Onondaga County Supervisors,* 16 Mich. 254;
*Steckert* v. *East Saginaw,* 22 Mich. 104; *Pack* v. *Barton,* 47 Mich. 520; *At-
torney General* v. *Joy,* 55 Mich. 94; *Callaghan* v. *Chipman,* 59 Mich. 610; *At-
torney General* v. *Rice,* 64 Mich. 385; *People ex rel. Hart* v. *McElroy,* 72 Mich
446; *Sackrider* v. *Saginaw County Supervisors,* 79 Mich. 59; *Stow* v. *Grand*

Opinion of the Court.

and cotton laces imported by Boyd, Sutton & Co.; and on colored cotton cloths imported by Herman, Sternbach & Co. 26 Stat. 567, c. 1244, § 1.

Rapids, 79 Mich. 595; Rode v. Phelps, 80 Mich. 598; Caldwell v. Ward, 83 Mich. 13; People ex rel. v. Burch, 84 Mich. 408.

Minnesota. — In this State it is held that the journals control the enrolled act. Supervisors v. Heenan, 2 Minn. 330; State v. Hastings, 24 Minn. 78; Burt v. Winona & St. Peter Railroad, 31 Minn. 472; Minnesota v. Peterson, 38 Minn. 143; Lincoln v. Haugan, 45 Minn. 451.

Mississippi. — In this State the enrolled act is held conclusive. In one case a different rule was laid down, namely, in the case of Brady v. West, 50 Miss. 68. The case was overruled. The following cases hold the law conclusive: Green v. Weller, 32 Miss. 650; Green v. Weller, 33 Miss. 735; Swann v. Buck, 40 Miss. 268; Ex parte Wren, 63 Miss. 512.

Missouri. — In this State the enrolled act was at first held conclusive, though where an amendment to the constitution was in question, the journals were consulted. State v. McBride, 4 Mo. 303.

The following case held the enrolled act to be conclusive: Pacific R. R. v. The Governor, 23 Mo. 353.

Upon the change of the constitution the legislative journals have been allowed to impeach the recorded act. Bradley v. West, 60 Mo. 33; State v. Mead, 71 Mo. 266.

Montana. — In this State no cases have been found on the subject.

Nebraska. — In this State the journals are used to impeach the enrolled act. Hull v. Miller, 4 Neb. 503; State v. Liedtke, 9 Neb. 462; Cottrell v. The State, 9 Neb. 125; Ballou v. Black, 17 Neb. 389; State v. McLelland, 18 Neb. 236; State ex rel. Poole v. Robinson, 20 Neb. 96; In re Groff, 21 Neb. 647; State v. Van Duyn, 24 Neb. 586.

Nevada. — In this State the enrolled act is held conclusive. State v. Swift, 10 Nev. 176; State v. Rogers, 10 Nev. 250; State v. Glenn, 18 Nev. 34.

In State ex rel. Stevenson v. Tufly, 19 Nev. 391, where the constitution required an amendment to be entered in full on the journals, an amendment was held invalid because the requirement was not complied with.

New Hampshire. — In this State the enrolled act is controlled by the journals. Opinions of the Justices, 35 N. H. 579; Opinions of the Justices, 45 N. H. 607; Opinions of the Justices, 52 N. H. 622.

New Jersey. — In this State the enrolled act is held to be the most appropriate evidence of the law, and is not overcome by inconsistent entries in the journals. Pangborn v. Young, 32 N. J. Law, 29; Freeholders of Passaic County v. Stevenson, 46 N. J. Law, 173; Standard Underground Cable Co. v. The Attorney General, 46 N. J. Eq. 270.

New York. — In New York the Revised Statutes (1 Rev. Stats. 187, sections 10 and 11) provided that the Secretary of State should receive the enrolled act, and should endorse upon it the day, month and year when the same became a law, and that his certificate should be conclusive of the

The importers severally protested against the assessment upon the ground that the act was not a law of the United

---

facts stated therein. There was also a provision that no bill should be deemed to be passed by the assent of two-thirds of the members, unless the fact was certified by the presiding officer of each house. The question arose in a number of cases whether certain acts had been passed which were acts of incorporation and were required by the constitution of New York to be adopted by a two-thirds vote. It was held that, for the purpose of ascertaining the vote, recourse might be had to the original enrolled act on file in the Secretary of State's office, and that the absence of the certificate of the presiding officers to a two-thirds vote avoided the act. *Thomas* v. *Dakin*, 22 Wend. 9; *Warner* v. *Beers*, 23 Wend. 103; *Hunt* v. *Van Alstyne*, 25 Wend. 603; *People* v. *Purdy*, 2 Hill, 31; *Purdy* v. *People*, 4 Hill, 384; *De Bow* v. *People*, 1 Denio, 9; *Commercial Bank of Buffalo* v. *Sparrow*, 2 Denio, 97.

It was also stated by one or two judges in a *semble* (*Warner* v. *Beers*, 23 Wend. 125; *People* v. *Purdy*, 4 Hill, 384; *De Bow* v. *People*, 1 Denio, 14) that the journals might also be examined, but these dicta have not been followed. The present law in New York is that the journals cannot be consulted to determine whether an act has been passed by the requisite vote. *People* v. *Chenango County Supervisors*, 8 N. Y. 317; *People* v. *Devlin*, 33 N. Y. 269, 283; *People* v. *Marlborough Highway Commissioners*, 54 N. Y. 276.

In the case of *People* v. *Petrea*, 92 N. Y. 128, where the constitution required that all acts, like the act in question, to be valid must be reported by a commission, it was held that the journal might be resorted to to show that the act was not reported by the commission. This view grew out of a peculiar provision of the constitution, and does not take New York out of the line of those States which hold that the enrolled act cannot be impeached by entries upon the journals.

*North Carolina.* — In North Carolina it is held that the enrolled act is conclusive. *Broadnax* v. *Groom*, 64 N. C. 244; *State ex rel. Scarborough* v. *Robinson*, 81 N. C. 409.

*Ohio.* — In this State the journals are permitted to control the enrolled act. *State* v. *Moffitt*, 5 Ohio, 358; *Miller* v. *The State*, 3 Ohio St. 475; *Fordyce* v. *Godman*, 20 Ohio St. 1; *Herron* v. *Smith*, 44 Ohio St. 348; *State* v. *Kiesewetter*, 45 Ohio St. 254.

*Oregon.* — In this State the journals control the enrolled act. *Mumford* v. *Sewall*, 11 Ore. 67, 71; *State* v. *Wright*, 14 Ore. 365.

*Pennsylvania.* — In this State, while the question is not clearly settled, the tendency of the decisions is towards the conclusiveness of the enrolled act. *Speer* v. *Plank Road Co.*, 22 Penn. St. 376; *Southwark Bank* v. *The Commonwealth*, 26 Penn. St. 446; *Kilgore* v. *Magee*, 85 Penn. St. 401; *Commonwealth* v. *Martin*, 107 Penn. St. 185.

In *Southwark Bank* v. *The Commonwealth*, the journals were consulted to determine which of two bills passed first. In *Commonwealth* v. *Martin*, the

States. ·Upon appeal to the Board of General Appraisers under the act of June 10, 1890, known as the Customs Administrative Act, the decision of the collector in each case was approved, c. 407, secs. 14, 15, 26 Stat. 131, 137. The judg-

---

presiding judge of the lower court declined to look into the journals, following *Pangborn* v. *Young*, and the case was decided by the Supreme Court without examining the journals.

*Rhode Island* — In this State we have found no cases on the subject.

*South Carolina.* — In this State the journals are permitted to control the presumption from the enrolled act. *State* v. *Platt*, 2 S. C. 150; *State* v. *Smalls*, 11 S. C. 262; *Walker* v. *South Carolina*, 12 S. C. 200; *State* v. *Hagood*, 13 S. C. 46.

*Tennessee.* — In Tennessee the journals are permitted to control the presumption from the enrolled act. *State* v. *McConnell*, 3 Lea, 332; *Gaines* v. *Horrigan*, 4 Lea, 608; *Williams* v. *The State*, 6 Lea, 549; *Brewer* v. *Huntingdon*, 86 Tenn. 732; *State* v. *Algood*, 87 Tenn. 163.

*Texas.* — In Texas the enrolled act is held to be the best evidence and is not controlled by the journals. *Central Pacific Railway* v. *Hearne*, 32 Texas, 546; *Blessing* v. *Galveston*, 42 Texas, 641; *Houston & Texas Central Railway* v. *Odum*, 53 Texas, 343; *Day Land & Cattle Co.* v. *The State*, 68 Texas, 526; *Usener* v. *The State*, 8 Texas App. 177; *Hunt* v. *The State*, 22 Texas App. 396; *Ex parte Tipton*, 28 Texas App. 438.

In *Hunt* v. *The State, supra*, the journals were examined, but *Ex parte Tipton* practically overrules that case, and restores to authority *Usener* v. *The State*, which held the enrolled act conclusive.

*Vermont.* — In this State there is no decision by the Supreme Court of the State. Judge Prentiss, of the United States District Court, *In the matter of Wellman*, 20 Vermont, 656, expressed the opinion that the enrolled act was the only proper evidence, not only of its existence as a law, but of the time of its commencement, " though it may be necessary and admissible in some instances, particularly when an act becomes a law by not being signed or returned with objections, or by being returned and repassed by Congress, to carry back the inquiry to the legislative journals."

*Virginia.* — In this State the enrolled act is not conclusive, and the journals are permitted to control the presumption therefrom. *Wise* v. *Biggar*, 79 Va. 269.

*Washington.* — In this State we have found no cases on the subject.

*West Virginia.* — In this State the enrolled act is controlled by entries upon the journals. *Osborn* v. *Staley*, 5 W. Va. 85.

*Wisconsin.* — In this State the presumption from the enrolled act is controlled by the journals. *Watertown* v. *Cady*, 20 Wis. 501; *Bound* v. *Wisconsin Central Railroad Co.*, 45 Wis. 543; *Meracle* v. *Down*, 64 Wis. 323.

*Wyoming.* — In this State the presumption from the enrolled act is controlled by the journals. *Brown* v. *Nash*, 1 Wyo. 85; *Union Pacific Railroad* v. *Carr*, 1 Wyo. 96.

ment of the board having been affirmed by the Circuit Courts of the United States in the respective districts in which these matters arose, the cases have been brought here for review.

The appellants question the validity of the act of October 1, 1890, upon three grounds to be separately examined.

*First.* The seventh section of article one of the Constitution of the United States provides: "All bills for raising revenue shall originate in the House of Representatives, but the Senate may propose or concur with amendments as on other bills.

"Every bill which shall have passed the House of Representatives and the Senate, shall, before it becomes a law, be presented to the President of the United States; if he approve he shall sign it, but if not he shall return it, with his objections to that house in which it shall have originated, who shall enter the objections at large on their journal, and proceed to reconsider it. If, after such reconsideration, two-thirds of that house shall agree to pass the bill, it shall be sent, together with the objections, to the other house, by which it shall likewise be reconsidered, and, if approved by two-thirds of that house, it shall become a law. But in all such cases the votes of both houses shall be determined by yeas and nays, and the names of the persons voting for and against the bill shall be entered on the journal of each house respectively. If any bill shall not be returned by the President within ten days (Sundays excepted) after it shall have been presented to him, the same shall be a law, in like manner as if he had signed it, unless the Congress by their adjournment prevent its return, in which case it shall not be a law.

"Every order, resolution or vote to which the concurrence of the Senate and House of Representatives may be necessary (except on a question of adjournment) shall be presented to the President of the United States; and before the same shall take effect, shall be approved by him, or being disapproved by him, shall be repassed by two-thirds of the Senate and House of Representatives, according to the rules and limitations prescribed in the case of a bill."

The Revised Statutes provide that "whenever a bill, order, resolution or vote of the Senate and House of Representatives,

having been approved and signed by the President, or not having been returned by him with his objections, becomes a law or takes effect, it shall forthwith be received by the Secretary of State from the President; and whenever a bill, order, resolution or vote is returned by the President with his objections, and, on being reconsidered, is agreed to be passed, and is approved by two-thirds of both houses of Congress, and thereby becomes a law or takes effect, it shall be received by the Secretary of State from the President of the Senate or Speaker of the House of Representatives in whichsoever house it shall last have been so approved, and he shall carefully preserve the originals." Sec. 204.

The original enrolled act in question, designated on its face "H. R. 9416," was received at the Department of State October 1, 1890, and, when so received, was attested by the signatures of Thomas B. Reed, Speaker of the House of Representatives, and Levi P. Morton, Vice-President of the United States and President of the Senate, and had thereon these endorsements:

"Approved October 1st, 1890.　　　　　BENJ. HARRISON."

"I certify that this act originated in the House of Representatives.
　　　　　　　　　　　　　　"EDW. McPHERSON, Clerk."

It is made the duty of the Secretary of State to furnish to the Congressional Printer "a correct copy of every act and joint resolution, as soon as possible after its approval by the President, or after it has become a law in accordance with the Constitution without such approval." That duty was performed by the Secretary of State with respect to the act in question, and the act appears in the volume of statutes published and distributed under the authority of the United States. Rev. Stat. §§ 210, 3803, 3805, 3807, 3808.

The contention of the appellants is, that this enrolled act, in the custody of the Secretary of State, and appearing, upon its face, to have become a law in the mode prescribed by the Constitution, is to be deemed an absolute nullity, in all its parts, because — such is the allegation — it is shown by the

Congressional record of proceedings, reports of committees of each house, reports of committees of conference, and other papers printed by authority of Congress, and having reference to house bill 9416, that a section of the bill, as it finally passed, was not in the bill authenticated by the signatures of the presiding officers of the respective houses of Congress, and approved by the President. The section alleged to have been omitted was as follows;

" SEC. 30. That on all original and unbroken factory packages of smoking and manufactured tobacco and snuff, held by manufacturers or dealers at the time the reduction herein provided for shall go into effect, upon which the tax has been paid, there shall be allowed a drawback or rebate of the full amount of the reduction, but the same shall not apply in any case where the claim has not been presented within sixty days following the date of reduction; and such rebate to manufacturers may be paid in stamps at the reduced rate; and no claim shall be allowed or drawback paid for a less amount than five dollars. It shall be the duty of the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, to adopt such rules and regulations and to prescribe and furnish such blanks and forms as may be necessary to carry this section into effect. For the payment of the rebates provided for in this section there is hereby appropriated, any money in the Treasury not otherwise appropriated."

The argument, in behalf of the appellants, is, that a bill, signed by the Speaker of the House of Representatives and by the President of the Senate, presented to and approved by the President of the United States, and delivered by the latter to the Secretary of State, as an act passed by Congress, does not become a law of the United States if it had not in fact been passed by Congress. In view of the express requirements of the Constitution the correctness of this general principle cannot be doubted. There is no authority in the presiding officers of the House of Representatives and the Senate to attest by their signatures, nor in the President to approve, nor in the Secretary of State to receive and cause to be published, as a legislative act, any bill not passed by Congress.

But this concession of the correctness of the general principle for which the appellants contend does not determine the precise question before the court; for it remains to inquire as to the nature of the evidence upon which a court may act when the issue is made as to whether a bill, originating in the House of Representatives or the Senate, and asserted to have become a law, was or was not passed by Congress. This question is now presented for the first time in this court. It has received, as its importance required that it should receive, the most deliberate consideration. We recognize, on one hand, the duty of this court, from the performance of which it may not shrink, to give full effect to the provisions of the Constitution relating to the enactment of laws that are to operate wherever the authority and jurisdiction of the United States extend. On the other hand, we cannot be unmindful of the consequences that must result if this court should feel obliged, in fidelity to the Constitution, to declare that an enrolled bill, on which depend public and private interests of vast magnitude, and which has been authenticated by the signatures of the presiding officers of the two houses of Congress, and by the approval of the President, and been deposited in the public archives, *as an act of Congress*, was not in fact passed by the House of Representatives and the Senate, and therefore did not become a law.

The clause of the Constitution upon which the appellants rest their contention that the act in question was never passed by Congress is the one declaring that " each house shall keep a journal of its proceedings, and from time to time publish the same, except such parts as may in their judgment require secrecy; and the yeas and nays of the members of either house on any question shall, at the desire of one-fifth of those present, be entered on the journal." Art. 1, sec. 5. It was assumed in argument that the object of this clause was to make the journal the best, if not conclusive, evidence upon the issue as to whether a bill was, in fact, passed by the two houses of Congress. But the words used do not require such interpretation. On the contrary, as Mr. Justice Story has well said, " the object of the whole clause is to insure publicity

to the proceedings of the legislature, and a correspondent responsibility of the members to their respective constituents. And it is founded in sound policy and deep political foresight. Intrigue and cabal are thus deprived of some of their main resources, by plotting and devising measures in secrecy. The public mind is enlightened by an attentive examination of the public measures; patriotism, and integrity, and wisdom obtain their due reward; and votes are ascertained, not by vague conjecture, but by positive facts. . . . So long as known and open responsibility is valuable as a check or an incentive among the representatives of a free people, so long a journal of their proceedings and their votes, published in the face of the world, will continue to enjoy public favor and be demanded by public opinion." 1 Story, Constitution, §§ 840, 841.

In regard to certain matters, the Constitution expressly requires that they shall be entered on the journal. To what extent the validity of legislative action may be affected by the failure to have those matters entered on the journal, we need not inquire. No such question is presented for determination. But it is clear that, in respect to the particular mode in which, or with what fulness, shall be kept the proceedings of either house relating to matters not expressly required to be entered on the journals; whether bills, orders, resolutions, reports and amendments shall be entered at large on the journal, or only referred to and designated by their titles or by numbers; these and like matters were left to the discretion of the respective houses of Congress. Nor does any clause of that instrument, either expressly or by necessary implication, prescribe the mode in which the fact of the original passage of a bill by the House of Representatives and the Senate shall be authenticated, or preclude Congress from adopting any mode to that end which its wisdom suggests. Although the Constitution does not expressly require bills that have passed Congress to be attested by the signatures of the presiding officers of the two houses, usage, the orderly conduct of legislative proceedings and the rules under which the two bodies have acted since the organization of the government, require that mode of authentication.

The signing by the Speaker of the House of Representatives, and by the President of the Senate, in open session, of an enrolled bill, is an official attestation by the two houses of such bill as one that has passed Congress. It is a declaration by the two houses, through their presiding officers, to the President, that a bill, thus attested, has received, in due form, the sanction of the legislative branch of the government, and that it is delivered to him in obedience to the constitutional requirement that all bills which pass Congress shall be presented to him. And when a bill, thus attested, receives his approval, and is deposited in the public archives, its authentication as a bill that has passed Congress should be deemed complete and unimpeachable. As the President has no authority to approve a bill not passed by Congress, an enrolled act in the custody of the Secretary of State, and having the official attestations of the Speaker of the House of Representatives, of the President of the Senate, and of the President of the United States, carries, on its face, a solemn assurance by the legislative and executive departments of the government, charged, respectively, with the duty of enacting and executing the laws, that it was passed by Congress. The respect due to coequal and independent departments requires the judicial department to act upon that assurance, and to accept, as having passed Congress, all bills authenticated in the manner stated: leaving the courts to determine, when the question properly arises, whether the act, so authenticated, is in conformity with the Constitution.

It is admitted that an enrolled act, thus authenticated, is sufficient evidence of itself — nothing to the contrary appearing upon its face — that it passed Congress. But the contention is, that it cannot be regarded as a law of the United States if the journal of either house fails to show that it passed in the precise form in which it was signed by the presiding officers of the two houses, and approved by the President. It is said that, under any other view, it becomes possible for the Speaker of the House of Representatives and the President of the Senate to impose upon the people as a law a bill that was never passed by Congress. But this possibility is too remote

to be seriously considered in the present inquiry. It suggests a deliberate conspiracy to which the presiding officers, the committees on enrolled bills and the clerks of the two houses must necessarily be parties, all acting with a common purpose to defeat an expression of the popular will in the mode prescribed by the Constitution. Judicial action based upon such a suggestion is forbidden by the respect due to a coördinate branch of the government. The evils that may result from the recognition of the principle that an enrolled act, in the custody of the Secretary of State, attested by the signatures of the presiding officers of the two houses of Congress, and the approval of the President, is conclusive evidence that it was passed by Congress, according to the forms of the Constitution, would be far less than those that would certainly result from a rule making the validity of Congressional enactments depend upon the manner in which the journals of the respective houses are kept by the subordinate officers charged with the duty of keeping them.

The views we have expressed are supported by numerous adjudications in this country, to some of which it is well to refer. In *Pangborn* v. *Young*, 32 N. J. Law (3 Vroom) 29, 37, the question arose as to the relative value, as evidence of the passage of a bill, of the journals of the respective houses of the legislature and the enrolled act authenticated by the signatures of the speakers of the two houses and by the approval of the governor. The bill there in question, it was alleged, originated in the house and was amended in the Senate, but, as presented to and approved by the governor, did not contain all the amendments made in the Senate. Referring to the provision in the constitution of New Jersey, requiring each house of the legislature to keep a journal of its proceedings — which provision is in almost the same words as the above clause quoted from the Federal Constitution — the court, speaking by Chief Justice Beasley, said that it was impossible for the mind not to incline to the opinion that the framers of the Constitution, in exacting the keeping of the journals, did not design to create records that were to be the ultimate and conclusive evidence of the conformity of

legislative action to the constitutional provisions relating to
the enactment of laws. In the nature of things, it was ob-
served, these journals must have been constructed out of loose
and hasty memoranda made in the pressure of business and
amid the distractions of a numerous assembly. The Chief
Justice said: " Can any one deny that, if the laws of the State
are to be tested by a comparison with these journals, so imper-
fect, so unauthenticated, that the stability of all written law
will be shaken to its very foundation? Certainly no person can
venture to say that many of our statutes, perhaps some of the
oldest and most important, those which affect large classes of
persons or on which great interests depend, will not be found
defective, even in constitutional particulars, if judged by this
criterion. . . . In addition to these considerations, in judg-
ing of consequences, we are to remember the danger under
the prevalence of such a doctrine to be apprehended from the
intentional corruption of evidences of this character. It is
scarcely too much to say that the legal existence of almost
every legislative act would be at the mercy of all persons
having access to these journals; for it is obvious that any law
can be invalidated by the interpolation of a few lines or the
obliteration of one name and the substitution of another in its
stead. I cannot consent to expose the state legislation to the
hazards of such probable error or facile fraud. The doctrine
contended for on the part of the evidence has no foundation,
in my estimation, on any considerations of public policy."
The conclusion was, that upon grounds of public policy, as
well as upon the ancient and well settled rules of law, a copy
of a bill bearing the signatures of the presiding officers of the
two houses of the legislature and the approval of the gover-
nor, and found in the custody of the Secretary of State, was
conclusive proof of the enactment and contents of a statute,
and could not be contradicted by the legislative journals or in
any other mode. These principles were affirmed by the New
Jersey Court of Errors and Appeals in *Freeholders of Passaic*
v. *Stevenson*, 46 N. J. Law (17 Vroom) 173, 184, and in *Stand-
ard Underground Co.* v. *Attorney General*, 46 N. J. Eq. (1
Dickinson) 270, 276.

In *Sherman* v. *Story*, 30 California, 253, 275, the whole subject was carefully considered. The court, speaking through Mr. Justice Sawyer, said: " Better, far better, that a provision should occasionally find its way into the statute through mistake, or even fraud, than that every act, state and national, should at any and all times be liable to be put in issue and impeached by the journals, loose papers of the legislature and parol evidence. Such a state of uncertainty in the statute laws of the land would lead to mischiefs absolutely intolerable. . . . The result of the authorities in England and in the other States clearly is, that, at common law, whenever a general statute is misrecited, or its existence denied, the question is to be tried and determined by the court as a question of law — that is to say, the court is bound to take notice of it, and inform itself the best way it can ; that there is no plea by which its existence can be put in issue and tried as a question of fact; that if the enrollment of the statute is in existence, the enrollment itself is the record, which is conclusive as to what the statute is, and cannot be impeached, destroyed or weakened by the journals of Parliament or any other less authentic or less satisfactory memorials ; and that there has been no departure from the principles of the common law in this respect in the United States, except in instances where a departure has been grounded on, or taken in pursuance of, some express constitutional or statutory provision requiring some relaxation of the rule, in order that full effect might be given to such provisions ; and in such instances the rule has been relaxed by judges with great caution and hesitation, and the departure has never been extended beyond an inspection of the journals of both branches of the legislature." The provisions of the California constitution, in force when the above case was decided, relating to the journals of legislative proceedings, were substantially like the clause upon that subject in the Constitution of the United States. The doctrines of the above case were reaffirmed in *People* v. *Burt*, 43 California, 560. But it should be observed that at a subsequent date a new constitution was adopted in California, under which the journals have been examined to impeach an

enrolled bill.  *County of San Mateo* v. *Southern Pacific Railroad Co.*, 8 Sawyer, 238, 294.

A case very much in point is *Ex parte Wren*, 63 Mississippi, 512, 527, 532.  The validity of a certain act was there questioned on the ground that, although signed by the presiding officers of the two houses of the legislature, and approved by the governor, it was not law, because it appeared from the journals of those bodies, kept in pursuance of the constitution, that the original bill, having passed the house, was sent to the Senate, which passed it with numerous amendments, in all of which the house concurred; but the bill, as approved by the governor, did not contain certain amendments which bore directly upon the issues in the case before the court.  The court, in a vigorous opinion delivered by Mr. Justice Campbell, held that the enrolled act, signed by the President of the Senate, and the Speaker of the House of Representatives and the governor is the sole exposition of its contents, and the conclusive evidence of its existence according to its purport, and that it is not allowable to look further to discover the history of the act or ascertain its provisions.  After a careful analysis of the adjudged cases the court said: "Every other view *subordinates* the legislature and disregards that coequal position in our system of the three departments of government.  If the validity of every act published as law is to be tested by examining its history, as shown by the journals of the two houses of the legislature, there will be an amount of litigation, difficulty and painful uncertainty appalling in its contemplation, and multiplying a hundredfold the alleged uncertainty of the law.  Every suit before every court, where the validity of a statute may be called in question as affecting the right of a litigant, will be in the nature of an appeal or writ of error or bill of review for errors apparent on the face of the legislative records, and the journals must be explored to determine if some contradiction does not exist between the journals and the bill signed by the presiding officers of the two houses.  What is the law to be declared by the court?  It must inform itself as best it can what is the law.  If it may go beyond the enrolled and signed bill and try its validity by

the record contained in the journals, it must perform this task as often as called on, and every court must do it. A justice of the peace must do it, for he has as much right, and is as much bound to preserve the constitution and declare and apply the law as any other court, and we will have the spectacle of examination of journals by justices of the peace, and statutes declared to be not law as the result of their journalistic history, and the Circuit and Chancery Courts will be constantly engaged in like manner, and this court, on appeal, have often to try the correctness of the determination of the court below, as to the conclusion to be drawn from the legis- lative journals on the inquiry as to the validity of the statutes thus tested. . . . Let the courts accept as statutes, duly enacted, such bills as are delivered by the legislature as their acts authenticated as such in the prescribed mode."

In *Weeks* v. *Smith,* 81 Maine, 538, 547 it was said: "Legis- lative journals are made amid the confusion of a despatch of business, and, therefore, much more likely to contain errors than the certificates of the presiding officers are to be untrue. Moreover public policy requires that the enrolled statutes of our State, fair upon their faces, should not be put in question after the public have given faith to their validity. No man should be required to hunt through the journals of a legisla- ture to determine whether a statute, properly certified by the speaker of the house and the president of the senate and approved by the governor, is a statute or not. The enrolled act, if a public law, and the original, if a private act, have always been held in England to be records of the highest order, and, if they carry no 'death' wounds' in themselves, to be absolute verity, and of themselves conclusive."

To the same general effect are *Brodnax* v. *Commissioners,* 64 Nor. Car. 244, 248; *State of Nevada* v. *Swift,* 10 Nevada, 176; *Evans* v. *Browne,* 30 Indiana, 514; *Edgar* v. *Randolph County Com'rs,* 70 Indiana, 331, 338; *Pacific Railroad* v. *The Governor,* 23 Missouri, 353, 362 *et seq.;* *Louisiana Lottery Co.* v. *Richoux,* 23 La. Ann. 743. There are cases in other state courts which proceed upon opposite grounds from those we have indicated as proper. But it will be found, upon

examination, that many of them rested upon constitutional or statutory provisions of a peculiar character, which, expressly, or by necessary implication, required or authorized the court to go behind the enrolled act when the question was, whether the act, as authenticated and deposited in the proper office, was duly passed by the legislature. This is particularly the case in reference to the decisions in Illinois. *Spangler* v. *Jacoby*, 14 Illinois, 297; *Turley* v. *County of Logan*, 17 Illinois, 151; *Prescott* v. *Canal Trustees*, 19 Illinois, 324; *Supervisors* v. *People*, 25 Illinois, 181; *Ryan* v. *Lynch*, 68 Illinois, 160; *People* v. *Barnes*, 35 Illinois, 121. In the last-named case it was said: " Were it not for the somewhat peculiar provision of our Constitution, which requires that all bills before they can become laws shall be read three several times in each house, and shall be passed by a vote of a majority of all the members-elect, a bill thus signed and approved would be conclusive of its validity and binding force as a law. . . . According to the theory of our legislation, when a bill has become a law, there must be record evidence of every material requirement, from its introduction until it becomes a law. And this evidence is found upon the journals of the two houses." But the court added: " We are not, however, prepared to say that a different rule might not have subserved the public interest equally well, leaving the legislature and the executive to guard the public interest in this regard, or to become responsible for its neglect."

The case of *Gardner* v. *The Collector*, 6 Wall. 499, 511, was relied on in argument as supporting the contention of the appellants.

The question there was as to the time when an act of Congress took effect; the doubt, upon that point, arising from the fact that the month and day, but not the year, of the approval of the act by the President appeared upon the enrolled act in the custody of the Department of State. This omission, it was held, could be supplied in support of the act from the legislative journals. It was said by the court: " We are of opinion, therefore, on principle as well as authority, that whenever a question arises in a court of law of the existence of a statute,

or of the time when a statute took effect, or of the precise terms of a statute, the judges who are called upon to decide it have a right to resort to any source of information which in its nature is capable of conveying to the judicial mind a clear and satisfactory answer to such question; always seeking first for that which in its nature is most appropriate, unless the positive law has enacted a different rule." There was no question in that case as to the existence or terms of a statute, and the point in judgment was that the time when an admitted statute took effect, not appearing from the enrolled act, could be shown by the legislative journals. It is scarcely necessary to say that that case does not meet the question here presented.

Nor do the cases of *South Ottawa* v. *Perkins*, 94 U. S. 260; *Walnut* v. *Wade*, 103 U. S. 683; and *Post* v. *Supervisors*, 105 U. S. 667, proceed upon any ground inconsistent with the views we have expressed. In each of those cases it was held that the question whether a seeming act of the legislature became a law in accordance with the Constitution, was a judicial one, to be decided by the courts and judges, and not a question of fact to be tried by a jury; and without considering the question on principle, this court held, in deference to the decisions of the Supreme Court of Illinois, interpreting the constitution of that State, that it was competent for the court, in determining the validity of an enrolled act, to consult the legislative journals.

Some reliance was also placed by appellants upon section 895 of the Revised Statutes, providing that "extracts from the journals of the Senate, or of the House of Representatives, and of the Executive Journal of the Senate when the injunction of secrecy is removed, certified by the secretary of the Senate or by the clerk of the House of Representatives, shall be admitted as evidence in the courts of the United States, and shall have the same force and effect as the originals would have if produced and authenticated in court." But referring now only to matters which the Constitution does not require to be entered on the journals, it is clear that this is not a statutory declaration that the journals are the highest evidence of the

facts stated in them, or complete evidence of all that occurs
in the progress of business in the respective houses; much less
that the authentication of an enrolled bill, by the official sig-
natures of the presiding officers of the two houses and of the
President, as an act which has passed Congress, and been ap-
proved by the President, may be overcome by what the jour-
nal of either house shows or fails to show.

We are of opinion, for the reasons stated, that it is not com-
petent for the appellants to show, from the journals of either
house, from the reports of committees or from other documents
printed by authority of Congress, that the enrolled bill desig-
nated H. R. 9416, as finally passed, contained a section that
does not appear in the enrolled act in the custody of the State
Department.

*Second.* The third section of the act of October 1st, 1890, c.
1244, § 3, is in these words:

"SEC. 3. That with a view to secure reciprocal trade with
countries producing the following articles, and for this purpose,
on and after the first day of January, eighteen hundred and
ninety-two, whenever, and so often as the President shall be
satisfied that the government of any country producing and
exporting sugars, molasses, coffee, tea and hides, raw and un-
cured, or any of such articles, imposes duties or other exac-
tions upon the agricultural or other products of the United
States, which in view of the free introduction of such sugar,
molasses, coffee, tea and hides into the United States he may
deem to be reciprocally unequal and unreasonable, he shall
have the power and it shall be his duty to suspend, by procla-
mation to that effect, the provisions of this act relating to the
free introduction of such sugar, molasses, coffee, tea and hides,
the production of such country, for such time as he shall deem
just, and in such case and during such suspension duties shall
be levied, collected and paid upon sugar, molasses, coffee, tea
and hides, the product of or exported from such designated
country as follows, namely:

"All sugars not above number thirteen Dutch standard in
color shall pay duty on their polariscopic tests as follows,
namely:

"'All sugars not above number thirteen Dutch standard in color, all tank bottoms, sirups of cane juice or of beet juice, melada, concentrated melada, concrete and ·concentrated molasses, testing by the polariscope not above seventy-five degrees, seven-tenths of one cent per pound; and for every additional degree or fraction of a degree shown by the polariscopic test, two-hundredths of one cent per pound additional.

"All sugars above number thirteen Dutch standard in color shall be classified by the Dutch standard of color, and pay duty as follows, namely: All sugar above number thirteen and not above number sixteen Dutch standard of color, one and three-eighths cents per pound.

"All sugar above number sixteen and not above number twenty Dutch standard of color, one and five-eighths cents per pound.

"All sugars above number twenty Dutch standard of color, two cents per pound.

"·Molasses testing above fifty-six degrees, four cents per gallon.

"Sugar drainings and sugar sweepings shall be subject to duty either as molasses or sugar, as the case may be, according to polariscopic-test.

"On coffee, three cents per pound.

"On tea, ten cents per pound.

"Hides, raw or uncured, whether dry, salted or pickled, Angora goatskins, raw, without the wool, unmanufactured, asses' skins, raw or unmanufactured, and skins, except sheepskins, with the wool on, one and one-half cents per pound." 26 Stat. 567, 612.

The plaintiffs in error contend that this section, so far as it authorizes the President to suspend the provisions of the act relating to the free introduction of sugar, molasses, coffee, tea, and hides, is unconstitutional, as delegating to him both legislative and treaty-making powers, and, being an essential part of the system established by Congress, the entire act must be declared null and void. On behalf of the United States it is insisted that legislation of this character is sustained by an early decision of this court and by the practice of the govern-

ment for nearly a century, and that, even if the third section were unconstitutional, the remaining parts of the act would stand.

The decision referred to is *The Brig Aurora*, 7 Cranch, 382, 388. What was that case?. The non-intercourse act of March 1, 1809, c. 24, secs. 4, 11, forbidding the importation, after May 20, 1809, of goods, wares or merchandise from any port or place in Great Britain or France, provided that "the President of the United States be, and he hereby is, authorized, in case either France or Great Britain shall so revoke or modify her edicts as that they shall cease to violate the neutral commerce of the United States, to declare the same by proclamation;" after which the trade suspended by that act and the act laying an embargo could "be renewed with the nation so doing." 2 Stat. 528. The act of 1809 expired on the 1st of May, 1810, on which day Congress passed another act, c. 39, § 4, declaring that in case either Great Britain or France, before a named day, *so* revoked or-modified her edicts "as that they shall cease to violate the neutral commerce of the United States, which fact the President of the United States shall declare by proclamation, and if the other nation shall not" within a given time revoke or modify her edicts in like manner,. then certain sections of the act of 1809 "shall from and after the expiration of three months from the date of the proclamation aforesaid, be revived and have full force and effect, so far as relates to the dominions, colonies and dependencies, and to the articles the growth, produce or manufacture of the dominions, colonies and dependencies of the nation thus refusing or neglecting to revoke or modify her edicts in the manner aforesaid. And the restrictions imposed by this act shall, from the date of such proclamation, cease and be discontinued in relation to the nation revoking or modifying her decrees in the manner aforesaid." 2 Stat. 605, 606. On the 2d of November, 1810, President Madison issued his proclamation declaring that France had so revoked or modified her edicts as that they ceased to violate the neutral commerce of the United States. In the argument of that case it was contended by Mr. Joseph R. Ingersoll that Con-

gress could not transfer legislative power to the President, and that to make the revival of a law depend upon the President's proclamation was to give that proclamation the force of a law. To this it was replied that the legislature did not transfer any power of legislation to the President; that they only prescribed the evidence which should be admitted of a fact, upon which the law should go into effect. Mr. Justice Johnson, speaking for the whole court, said: " We can see no sufficient reason why the legislature should not exercise its discretion in reviving the act of March 1, 1809, either expressly or conditionally, as their judgment should direct. The 19th section of that act, declaring that it should continue in force to a certain time, and no longer, could not restrict their power of extending its operation without limitation upon the occurrence of any subsequent combination of events." This certainly is a decision that it was competent for Congress to make the revival of an act depend upon the proclamation of the President, showing the ascertainment by him of the fact that the edicts of certain nations had been *so* revoked or modified that they did not violate the neutral commerce of the United States. The same principle would apply in the case of the suspension of an act upon a contingency to be ascertained by the President, and made known by his proclamation.

To what extent do precedents in legislation sustain the validity of the section under consideration, so far as it makes the suspension of certain provisions and the going into operation of other provisions of an act of Congress depend upon the action of the President based upon the occurrence of subsequent events, or the ascertainment by him of certain facts, to be made known by his proclamation? If we find that Congress has frequently, from the organization of the government to the present time, conferred upon the President powers, with reference to trade and commerce, like those conferred by the third section of the act of October 1, 1890, that fact is entitled to great weight in determining the question before us.

During the administration of Washington, Congress, by an act approved June 4, 1794, c. 41, authorized the President, when Congress was not in session, and for a prescribed period,

" whenever, in his opinion, the public safety shall so require, to lay an embargo on all ships and vessels in the ports of the United States, or upon the ships and vessels of the United States, or the ships and vessels of any foreign nation, under such regulations as the circumstances may require, and to continue or revoke the same, whenever he shall think proper." 1 Stat. 372.

Congress passed, and President Adams approved, the act of June 13, 1798, c. 53, § 5, suspending commercial intercourse between the United States and France and its dependencies, and providing that if the government of France, and all persons acting by or under its authority, before the then next session of Congress, " shall clearly disavow, and shall be found to refrain from the aggressions, depredations and hostilities which have been and are by them encouraged and maintained against the vessels and other property of the citizens of the United States, and against their national rights and sovereignty, in violation of the faith of treaties and the laws of nations, and shall thereby acknowledge the just claims of the United States to be considered as in all respects neutral, and unconnected in the present European war, if the same shall be continued, then and thereupon it shall be lawful for the President of the United States, being well ascertained of the premises, to remit and discontinue the prohibitions and restraints hereby enacted and declared ; and he shall be and is hereby authorized to make proclamation thereof accordingly." 1 Stat. 565, 566.   A subsequent act, approved· February 9, 1799, c. 2, § 4, further suspending commercial intercourse with France and its dependencies, contained this section : " That at any time after the passing of this act, it shall be lawful for the President of the United States, if he shall deem it expedient and consistent with the interest of the United States, by his order, to remit and discontinue, for the time being, the restraints and prohibitions aforesaid, either with respect to the French Republic, or to any island, port or place belonging to the said Republic, with which a commercial intercourse may safely be renewed ; and also to revoke such order, whenever, in his opinion, the interest of the United States shall require ;

and he shall be, and hereby is, authorized to make proclamation thereof accordingly." 1 Stat. 613, 615. Under the latter act the President issued, June 26, 1799, and May 21, 1800, proclamations declaring it lawful for vessels departing from the United States to enter certain ports of San Domingo. Works of John Adams, vol. 9, pp. 176, 177.

By an act of Congress, approved April 18, 1806, c. 29, it was made unlawful to import, after November 15, 1806, into the United States from any port or place in Great Britain or Ireland, or in any of the colonies or dependencies of Great Britain, articles of which leather, silk, hemp, flax, tin or brass was the material of chief value, woollen cloths whose invoice prices exceeded five shillings sterling per square yard, woollen hosiery, manufactures of glass, silver and plated wares, hats, nails, spikes, ready-made clothing, millinery, beer, ale, porter, pictures and prints. 2 Stat. 379. The operation of this act was suspended by the subsequent act of December 19, 1806, c. 1, § 3, until July 1, 1807. But the last act contained this section : "That the President of the United States be and he is hereby authorized further to suspend the operation of the aforesaid act, if in his judgment the public interest should require it: *Provided,* that such suspension shall not extend beyond the second Monday in December next." 2 Stat. 411. Both of these acts received the approval of President Jefferson.

An act of March 3, 1815, c. 77, approved by President Madison, provided that so much of the several acts imposing duties on the tonnage of ships and vessels, and on goods, wares and merchandise imported into the United States, as imposed a discriminating duty on tonnage between foreign vessels and vessels of the United States, and between goods imported into the United States in foreign vessels and vessels of the United States, be repealed, so far as the same respected the produce or manufacture of the nation to which such foreign ships or vessels belonged ; such repeal to take effect in favor of any foreign nation, " whenever the President of the United States shall be satisfied that the discriminating or countervailing duties of such foreign nation, so far as they operate to the disadvantage of the United States," had been abolished.

3 Stat. 224. Satisfactory proof having been received by President Monroe from the Free City of Bremen that from and after the 12th of May, 1815, all discriminating or countervailing duties of the said city, "so far as they operated to the disadvantage of the United States," had been abolished, he issued, July 24, 1818, his proclamation stating that the acts of Congress, upon that subject, were repealed, so far as the same related to the produce and manufacture of that city. Similar proclamations were issued by him in respect to the produce and manufactures of Hamburg, Lubec, Norway and the Dukedom of Oldenburg. 3 Stat. App. I, pp. 792, 793, 794, 795.

By an act approved March 3, 1817, c. 39, prohibiting the importation into the United States, in any foreign vessel, from and after July 4 of that year, of plaster of Paris, the production of any country, or its dependencies from which the vessels of the United States were not permitted to bring the same article, it was provided that the act should continue in force five years from January 31, 1817, provided "that if any foreign nation, or its dependencies, which have now in force regulations on the subject of the trade in plaster of Paris, prohibiting the exportation thereof to certain ports of the United States, shall discontinue such regulations, the President of the United States is hereby authorized to declare that fact by his proclamation, and the restrictions imposed by this act shall, from the date of such proclamation, cease and be discontinued in relation to the nation or its dependencies, discontinuing such regulations." 3 Stat. 361. Proclamations in execution of this act were issued by President Monroe, relating to our trade with Nova Scotia and New Brunswick. 3 Stat. App. pp. 791, 792.

By an act concerning discriminating duties of tonnage and impost, approved January 7, 1824, c. 4, § 4, it was provided that "upon satisfactory evidence being given to the President of the United States, by the government of any foreign nation, that no discriminating duties of tonnage or impost are imposed or levied within the ports of the said nation, upon vessels wholly belonging to citizens of the United States, or upon merchandise, the produce or manufacture thereof, imported in

the same, the President is hereby authorized to issue his proclamation, declaring that the foreign discriminating duties of tonnage and impost within the United States are, and shall be, suspended and discontinued, so far as respects the vessels of the said nation, and the merchandise of its produce or manufacture, imported into the United States in the same; the said suspension to take effect from the time of such notification being given to the President of the United States, and to continue so long as the reciprocal exemption of vessels belonging to citizens of the United States, and merchandise as aforesaid, thereon laden shall be continued, and no longer." 4 Stat. 3. A similar section was embodied in the act of May 24, 1828, c. 111, relating to the same subject, which is substantially preserved in section 4228 of the Revised Statutes. 4 Stat. 308. In execution of these acts, proclamations were issued by the Presidents of the United States as follows: Adams, July 1, 1828, 4 Stat. App. 815; Jackson, May 11, 1829, June 3, 1829, September 18, 1830, April 28, 1835, and September 1, 1836, 4 Stat. App. 814, 815, 816, 11 Stat. App. 781, 782; Polk, November 4, 1847, 9 Stat. App. 1001; Fillmore, November 1, 1850, 9 Stat. App. 1004; Buchanan, February 25, 1858, 11 Stat. App. 795; Lincoln, December 16, 1863, 13 Stat. App. 739; Johnson, December 28, 1866, and January 29, 1867, 14 Stat. App. 818, 819; Grant, June 12, 1869, November 20, 1869, February 25, 1871, December 19, 1871, September 4, 1872, and October 30, 1872, 16 Stat. App. 1127, 1130 to 1137, 17 Stat. App. 954, 956, 957; and Hayes, November 30, 1880, 21 Stat. 800.

A subsequent statute of May 31, 1830, c. 219, repealed all acts and parts of acts which imposed duties upon the tonnage of ships and vessels of foreign nations, provided the President of the United States should be satisfied that the discriminating or countervailing duties of such foreign nations, "so far as they operate to the disadvantage of the United States," had been abolished. 4 Stat. 425. This provision is preserved in section 4219 of the Revised Statutes.

Pursuant to the act of Congress of August 5, 1854, c. 269, § 2, carrying into effect the treaty between the United States and

Great Britain of June 5, 1854, President Pierce issued his procla-
mation, December 12, 1855, declaring that grain, flour, bread-
stuffs of all kinds, and numerous other specified articles, should
be admitted free of duty from Newfoundland, he having
received satisfactory evidence that that province had con-
sented, "in a due and proper manner," to have the provisions
of the above treaty extended to it, and to allow the United
States the full benefits of all its stipulations, so far as they
were applicable to Newfoundland.     10 Stat. 587; 11 Stat.
790.

By an act of Congress, approved March 6, 1866, c. 12, the
importation of neat cattle and the hides of neat cattle from
any foreign country into the United States was prohibited, the
operation of the act, however, to be suspended as to any
foreign country or countries, or any parts of such country
or countries, whenever the Secretary of the Treasury should
officially determine, and give public notice thereof, that such
importation would not tend to the introduction or spread
of contagious or infectious diseases among the cattle of the
United States.     The same act provided that "the President of
the United States, whenever in his judgment the importation
of neat cattle and the hides of neat cattle may be made with-
out danger of the introduction or spread of contagious or
infectious disease among the cattle of the United States, may,
by proclamation, declare the provisions of this act to be
inoperative, and the same shall be afterwards inoperative and
of no effect from and after thirty days from the date of said
proclamation."     14 Stat. 3.     These provisions constituted sec-
tions 2493 and 2494 of the Revised Statutes until the passage
of the act of March 3, 1883, 22 Stat. 489, c. 121, § 6.     And,
by the tariff act of 1890, the importation of neat cattle and
the hides of neat cattle from foreign countries was prohibited;
but authority is given to the Secretary of the Treasury to sus-
pend the operation of the act as to any country, whenever *he*
determines that such importation will not lead to the introduc-
tion or spread of contagious or infectious diseases among the
cattle of the United States.     26 Stat. 616, c. 1244, § 20.

In execution of section 4228 of the Revised Statutes, Presi-

dent Arthur issued a proclamation declaring that on and after the first day of March, 1884, so long as the products of, and articles proceeding from the United States, imported into the Islands of Cuba and Porto Rico, should be exempt from discriminating customs duties, any such duties on the products of, and articles proceeding from Cuba and Porto Rico under the Spanish flag, should be suspended, and discontinued. 23 Stat. 835. President Cleveland, by proclamation of October 13, 1886, revoked this suspension upon the ground that higher and discriminating duties continued to be imposed and levied in the ports named upon certain produce, manufactures or merchandise imported into them from the United States and from foreign countries, in vessels of the United States, than were imposed and levied on the like produce, manufactures or merchandise carried to those ports in Spanish vessels. 24 Stat. 1028.

By the 14th section of the act of June 26, 1884, c. 121, removing certain burdens on the American merchant marine, and encouraging the American foreign carrying trade, certain tonnage duties were imposed upon vessels entering the United States from any foreign port or place in North America, Central America, the West India Islands, Bahama Islands, Bermuda Islands, Sandwich Islands or Newfoundland; and the President was authorized to suspend the collection of so much of those duties, on vessels entering from certain ports, as might be in excess of the tonnage and lighthouse dues, or other equivalent tax or taxes, imposed on American vessels by the government of the foreign country in which such port was situated, and should upon the passage of the act, "and from time to time thereafter as often as it may become necessary by reason of changes in the laws of the foreign countries above mentioned, indicate by proclamation the ports to which such suspension shall apply, and the rate or rates of tonnage duty if any to be collected under such suspension." 23 Stat. 57. In execution of that act Presidents Arthur and Cleveland issued proclamations suspending the collection of duties on goods arriving from certain designated ports. 23 Stat. 841, 842, 844.

It would seem to be unnecessary to make further reference to acts of Congress to show that the authority conferred upon the President by the third section of the act of October 1, 1890, is not an entirely new feature in the legislation of Congress, but has the sanction of many precedents in legislation.[1] While some of these precedents are stronger than

---

[1] For instance, as to another subject: By the treaty of May 7, 1830, 8 Stat. 408, it was provided that "if litigations and disputes should arise between subjects of the Sublime Porte and citizens of the United States, the parties shall not be heard, nor shall judgment be pronounced, unless the American Dragoman be present . . . and even when they may have committed some offence, they shall not be arrested and put in prison by the local authorities, but they shall be tried by their minister or consul, and punished according to their offence, following in this respect, the usage observed towards other Franks."

On the 22d June, 1860, an act was passed to carry into effect this and other treaties of a like character, "giving certain judicial powers to consuls or other functionaries of the United States in those countries, and for other purposes." 12 Stat. 72, c. 179. Under this act the consuls of the United States in Egypt exercised judicial powers over citizens of the United States. *Dainese* v. *Hale*, 91 U. S. 13.

On the 23d of March, 1874, an act was passed which provided, 18 Stat. 23, c. 62, "that whenever the President of the United States shall receive satisfactory information that the Ottoman government or that of Egypt, has organized other tribunals, on a basis likely to secure to citizens of the United States; in their dominions, the same impartial justice which they now enjoy there under the judicial functions exercised by the minister, consuls and other functionaries of the United States, pursuant to the act of Congress approved the twenty-second of June, eighteen hundred and sixty . . . he is hereby authorized to suspend the operations of said acts as to the dominions in which such tribunals may be organized, so far as the jurisdiction of said tribunals may embrace matters now cognizable by the minister, consuls or other functionaries of the United States in said dominions, and to notify the government of the Sublime Porte, or that of Egypt, or either of them, that the United States, during such suspension will as aforesaid accept for their citizens the jurisdiction of the tribunals aforesaid, over citizens of the United States, which has heretofore been exercised by the minister, consuls or other functionaries of the United States."

This statute was the response made by the United States to a suggestion coming from the Egyptian government through the Turkish government, that mixed tribunals should be established in Egypt with jurisdiction of "disputes in civil and commercial matters between natives and foreigners, and between foreigners of different nationalities." 2 Foreign Relations, 1873, pp. 1100–1104. The scheme was successful. Codes were adopted;

others, in their application to the case before us, they all show that, in the judgment of the legislative branch of the government, it is often desirable, if not essential for the protection of the interests of our people, against the unfriendly or discriminating regulations established by foreign governments, in the interests of their people, to invest the President with large discretion in matters arising out of the execution of statutes relating to trade and commerce with other nations. If the decision in the case of *The Brig Aurora* had never been rendered, the practical construction of the Constitution, as given by so many acts of Congress, and embracing almost the entire period of our national existence, should not be overruled, unless upon a conviction that such legislation was clearly incompatible with the supreme law of the land. *Stuart* v. *Laird,* 1 Cranch, 299, 309; *Martin* v. *Hunter,* 1 Wheat. 304, 351; *Cooley* v. *Port Wardens,* 12 How. 299, 315; *Lithographic Co.* v. *Sarony,* 111 U. S. 53, 57; *The Laura,* 114 U. S. 411, 416.

The authority given to the President by the act of June 4, 1794, to lay an embargo on all ships and vessels in the ports of the United States, " whenever, in his opinion, the public safety shall so require," and under regulations, to be continued or revoked "whenever he shall think proper;" by the act of February 9, 1799, to remit and discontinue, for the time being, the restraints and prohibitions which Congress had prescribed with respect to commercial intercourse with the French Republic, "if he shall *deem* it expedient and consistent with the interest of the United States," and "to revoke such order, whenever, in his opinion, the interest of the United States shall require;" by the act of December 19, 1806, to suspend, for a named time, the operation of the non-importation act of the same year, "if in his judgment the public interest should

---

(Codes Égyptiens, Alexandrie, 1875,) the proclamation of suspension contemplated by the act of March 23, 1874, was issued by President Grant on the 27th of March, 1876, 19 Stat. 662; the quota of foreign judges assigned to the United States was filled by the Khedive upon the nomination of the President; and United States citizens became justiciable by this mixed tribunal.

require it;" by the act of May 1, 1810, to revive a former act, as to Great Britain or France, if either country had not, by a named day, *so* revoked or modified its edicts as not "to violate the neutral commerce of the United States;" by the acts of March 3, 1815, and May 31, 1830, to declare the repeal, as to any foreign nation, of the several acts imposing duties on the tonnage of ships and vessels, and on goods, wares and merchandise imported into the United States, when he should be "satisfied" that the discriminating duties of such foreign nations, "so far as they operate to the disadvantage of the United States," had been abolished; by the act of March 6, 1866, to declare the provisions of the act forbidding the importation into this country of neat cattle and the hides of neat cattle, to be inoperative, "whenever in his judgment" their importation "may be made without danger of the introduction or spread of contagious or infectious disease among the cattle of the United States;" must be regarded as unwarranted by the Constitution, if the contention of the appellants, in respect to the third section of the act of October 1, 1890, be sustained.

That Congress cannot delegate legislative power to the President is a principle universally recognized as vital to the integrity and maintenance of the system of government ordained by the Constitution. The act of October 1, 1890, in the particular under consideration, is not inconsistent with that principle. It does not, in any real sense, invest the President with the power of legislation. For the purpose of securing reciprocal trade with countries producing and exporting sugar, molasses, coffee, tea and hides, Congress itself determined that the provisions of the act of October 1, 1890, permitting the free introduction of such articles, should be suspended as to any country producing and exporting them, that imposed exactions and duties on the agricultural and other products of the United States, which the President deemed, that is, which he found to be, reciprocally unequal and unreasonable. Congress itself prescribed, in advance, the duties to be levied, collected and paid, on sugar, molasses, coffee, tea or hides, produced by or exported from such designated

country, while the suspension lasted. Nothing involving the expediency or the just operation of such legislation was left to the determination of the President. The words, "he may deem," in the third section, of course, implied that the President would examine the commercial regulations of other countries producing and exporting sugar, molasses, coffee, tea and hides, and form a judgment as to whether they were reciprocally equal and reasonable, or the contrary, in their effect upon American products. But when he ascertained the fact that duties and exactions, reciprocally unequal and unreasonable, were imposed upon the agricultural or other products of the United States by a country producing and exporting sugar, molasses, coffee, tea or hides, it became his duty to issue a proclamation declaring the suspension, as to that country, which Congress had determined should occur. He had no discretion in the premises except in respect to the duration of the suspension so ordered. But that related only to the enforcement of the policy established by Congress. As the suspension was absolutely required when the President ascertained the existence of a particular fact, it cannot be said that in ascertaining that fact and in issuing his proclamation, in obedience to the legislative will, he exercised the function of making laws. Legislative power was exercised when Congress declared that the suspension should take effect upon a named contingency. What the President was required to do was simply in execution of the act of Congress. It was not the making of law. He was the mere agent of the law-making department to ascertain and declare the event upon which its expressed will was to take effect. It was a part of the law itself as it left the hands of Congress that the provisions, full and complete in themselves, permitting the free introduction of sugars, molasses, coffee, tea and hides, from particular countries, should be suspended, in a given contingency, and that in case of such suspensions certain duties should be imposed.

"The true distinction," as Judge Ranney speaking for the Supreme Court of Ohio has well said, "is between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring authority or

discretion as to its execution, to be exercised under and in pursuance of the law. The first cannot be done; to the latter no valid objection can be made." *Cincinnati, Wilmington &c. Railroad* v. *Commissioners*, 1 Ohio St. 88. In *Moers* v. *City of Reading*, 21 Penn. St. 188, 202, the language of the court was : " Half the statutes on our books are in the alternative, depending on the discretion of some person or persons to whom is confided the duty of determining whether the proper occasion exists for executing them. But it cannot be said that the exercise of such discretion is the making of the law." So, in *Locke's Appeal*, 72 Penn. St. 491, 498 : " To assert that a law is less than a law, because it is made to depend on a future event or act, is to rob the legislature of the power to act wisely for the public welfare whenever a law is passed relating to a state of affairs not yet developed, or to things future and impossible to fully know." The proper distinction the court said was this : " The legislature cannot delegate its power to make a law; but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend. To deny this would be to stop the wheels of government. There are many things upon which wise and useful legislation must depend which cannot be known to the law-making power, and, must, therefore, be a subject of inquiry and determination outside of the halls of legislation."

What has been said is equally applicable to the objection that the third section of the act invests the President with treaty-making power.

The court is of opinion that the third section of the act of October 1, 1890, is not liable to the objection that it transfers legislative and treaty-making power to the President. Even if it were, it would not, by any means, follow that other parts of the act, those which directly imposed duties upon articles imported, would be inoperative. But we need not in this connection enter upon the consideration of that question.

*Third.* The act of October 1, 1890, c. 1244, sec. 1, par. 231, " Schedule E — Sugar," provides that " on and after July first, eighteen hundred and ninety-one, and until July first,

nineteen hundred and five, there shall be paid, from any moneys in the Treasury not otherwise appropriated, under the provisions of section three thousand six hundred and eighty-nine of the Revised Statutes, to the producer of sugar testing not less than ninety degrees by the polariscope, from beets, sorghum or sugar-cane grown within the United States, or from maple sap produced within the United States, a bounty of two cents per pound; and upon such sugar testing less than ninety degrees by the polariscope, and not less than eighty degrees, a bounty of one and three-fourths cents per pound, under such rules and regulations as the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, shall prescribe." 26 Stat. 567, 583.

Appellants contend that Congress has no power to appropriate money from the Treasury for the payment of these bounties, and that the provisions for them have such connection with the system established by the act of 1890 that the entire act must be held inoperative and void. The question of constitutional power thus raised depends principally, if not altogether, upon the scope and effect of that clause of the Constitution giving Congress power " to lay and collect taxes, duties, imposts and excises, to pay the debts and provide for the common defence and general welfare of the United States." Art. 1, sec. 8. It would be difficult to suggest a question of larger importance, or one the decision of which would be more far-reaching. But the argument that the validity of the entire act depends upon the validity of the bounty clause is so obviously founded in error that we should not be justified in giving the question of constitutional power, here raised, that extended examination which a question of such gravity would, under some circumstances, demand. Even if the position of the appellants with respect to the power of Congress to pay these bounties were sustained, it is clear that the parts of the act in which they are interested, namely, those laying duties upon articles imported, would remain in force. " It is an elementary principle," this court has said, "that the same statute may be in part constitutional and in part unconstitutional, and that if the parts are wholly inde-

pendent of each other, that which is constitutional may stand while that which is unconstitutional will be rejected." *Allen* v. *Louisiana,* 103 U. S. 80, 83. And in *Huntington* v. *Worthen,* 120 U. S. 97, 102, Mr. Justice Field, speaking for the court, said : "It is only when different clauses of an act are so dependent upon each other that it is evident the legislature would not have enacted one of them without the other — as when the two things provided are necessary parts of one system — that the whole act will fall with the invalidity of one clause. When there is no such connection and dependency, the act will stand, though different parts of it are rejected." It cannot be said to be evident that the provisions imposing duties on imported articles are so connected with or dependent upon those giving bounties upon the production of sugars in this country that the former would not have been adopted except in connection with the latter. Undoubtedly, the object of the act was not only to raise revenue for the support of the government, but to so exert the power of laying and collecting taxes and duties as to encourage domestic manufactures and industries of different kinds, upon the success of which, the promoters of the act claimed, materially depended the national prosperity and the national safety. But it cannot be assumed, nor can it be made to appear from the act, that the provisions imposing duties on imported articles would not have been adopted except in connection with the clause giving bounties on the production of sugar in this country. These different parts of the act, in respect to their operation, have no legal connection whatever with each other. They are entirely separable in their nature, and, in law, are wholly independent of each other. One relates to the imposition of duties upon imported articles; the other, to the appropriation of money from the Treasury for bounties on articles produced in this country. While, in a general sense, both may be said to be parts of a system, neither the words nor the general scope of the act justifies the belief that Congress intended they should operate as a whole, and not separately for the purpose of accomplishing the objects for which they were respectively designed. Unless it be impossible to avoid

it, a general revenue statute should never be declared inoperative in all its parts because a particular part relating to a distinct subject may be invalid. A different rule might be disastrous to the financial operations of the government, and produce the utmost confusion in the business of the entire country.

We perceive no error in the judgments below, and each is

*Affirmed.*

MR. JUSTICE LAMAR, (with whom concurred MR. CHIEF JUSTICE FULLER,) dissenting from the opinion but concurring in the judgments of the court.

THE CHIEF JUSTICE and myself concur in the judgment just announced. But the proposition maintained in the opinion, that the third section, known as the reciprocity provision, is valid and constitutional legislation, does not command our assent, and we desire to state very briefly the ground of our dissent from it. We think that this particular provision is repugnant to the first section of the first article of the Constitution of the United States, which provides that "all legislative powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives." That no part of this legislative power can be delegated by Congress to any other department of the government, executive or judicial, is an axiom in constitutional law, and is universally recognized as a principle essential to the integrity and maintenance of the system of government ordained by the Constitution. The legislative power must remain in the organ where it is lodged by that instrument. We think that the section in question does delegate legislative power to the executive department, and also commits to that department matters belonging to the treaty-making power, in violation of paragraph two of the second section of article two of the Constitution. It reads thus:

"§ 3. That with a view to secure reciprocal trade with countries producing the following articles, and for this purpose, on and after the first day of January, eighteen hundred and ninety-

two, whenever, and so often as the President shall be satis-
fied that the government of any country producing and export-
ing sugars, molasses, coffee, tea and hides, raw and uncured,
or any of such articles, imposes duties or other exactions upon
the agricultural or other products of the United States, which
in view of the free introduction of such sugar, molasses, coffee,
tea and hides into the United States *he may deem to be recip-
rocally unequal and unreasonable,* he shall have the power and
it shall be his duty to suspend, by proclamation to that effect,
the provisions of this act relating to the free introduction of
such sugar, molasses, coffee, tea and hides, the production of
such country, *for such time as he shall deem just,* and in such
case and during such suspension duties shall be levied, col-
lected and paid upon sugar, molasses, coffee, tea and hides,
the product of or exported from such designated country as
follows, namely." 26 Stat. 612.

We do not think that legislation of this character is sus-
tained by any decision of this court, or by precedents in
congressional legislation numerous enough to be properly
considered as the practice of the government. One of the
instances referred to, as legislation analogous to this section,
is that embodied in the acts of Congress of 1809 and 1810
known as the "non-intercourse acts," pronounced by this
court to be valid in the case of *The Brig Aurora,* 7 Cranch,
383. The act of March 1, 1809, forbidding any importation
after May 20, 1809, from Great Britain or France, provided
that "the President of the United States be, and he hereby is,
authorized, in case either France or Great Britain shall so
revoke or modify her edicts, as that they shall cease to violate
the neutral commerce of the United States, to declare the
same by proclamation," after which the trade suspended by
that act and the act laying an embargo could be renewed
with the nation so doing. 2 Stat. 528, c. 24, § 11. That act
having expired, Congress, on the first of May, 1810, passed an
act, (2 Stat. 605, c. 39, § 4,) which enacted "that in case either
Great Britain or France shall, before the third day of March
next, so revoke or modify her edicts as that they shall cease to
violate the neutral commerce of the United States, which fact

the President of the United States shall declare by proclama-tion, and if the other nation shall not, within three months thereafter, so revoke or modify her edicts in like manner," the restrictions of the embargo act, "shall, from and after the expiration of three months from the date of the proclamation aforesaid, be revived and have full force and effect, so far as relates to . . . . the nation thus refusing or neglecting to modify her edicts in the manner aforesaid. And the restric-tions imposed by this act shall, from the date of such procla-mation, cease and be discontinued in relation to the nation revoking or modifying her decrees in the manner aforesaid."

These enactments, in our opinion, transferred no legislative power to the President. The legislation was purely contin-gent. It provided for an ascertainment by the President of an event in the future, an event defined in the act and directed to be evidenced by his proclamation. It also prescribed the consequences which were to follow upon that proclamation. Such proclamation was wholly in the nature of an executive act, a prescribed mode of ascertainment, which involved no exercise by the President of what belonged to the law-making power. The supreme will of Congress would have been enforced whether the event provided for had or had not hap-pened, either in the continuance of the restrictions, on the one hand, or on the other, in their suspension.

But the purpose and effect of the section now under consid-eration are radically different. It does not, as was provided in the statutes of 1809 and 1810, entrust the President with the ascertainment of a fact therein defined upon which the law is to go into operation. It goes farther than that, and deputes to the President the power to suspend another section in the same act whenever " he may deem " the action of any foreign nation producing and exporting the articles named in that section to be " reciprocally unequal and unreasonable;" and it further deputes to him the power to continue that sus-pension and to impose revenue duties on the articles named " for such time as he may deem just." This certainly extends to the executive the exercise of those discretionary powers which the Constitution has vested in the law-making depart-

ment.   It unquestionably vests in the President the power to regulate our commerce with all foreign nations which produce sugar, tea, coffee, molasses, hides or any of such articles; and to impose revenue duties upon them for a length of time limited solely by his discretion, whenever he deems the revenue system or policy of any nation in which those articles are produced reciprocally unequal and unreasonable, in its operation upon the products of this country.

These features of this section are, in our opinion, in palpable violation of the Constitution of the United States, and serve to distinguish it from the legislative precedents which are relied upon to sustain it, as the practice of the government. None of these legislative precedents, save the one above referred to, have, as yet, undergone review by this court or been sustained by its decision.   And if there be any congressional legislation which may be construed as delegating to the President the power to suspend any law exempting any importations from duty, or to reimpose revenue duties on them, upon his own judgment as to what constitutes in the revenue policy of other countries a fair and reasonable reciprocity, such legislative precedents cannot avail as authority against a clear and undoubted principle of the Constitution. We say revenue policy, because the phrase "agricultural or other products of the United States" is comprehensive, and embraces our manufacturing and mining as well as agricultural products, all of which interests are thus entrusted to the discretion of the President, in the adjustment of trade relations with other countries, upon a basis of reciprocity.

Whilst, however, we cannot agree to the proposition that this particular section is valid and constitutional, we do not regard it as such an essential part of the Tariff Act as to invalidate all its other provisions; and we therefore concur in the judgment of this court affirming the judgments of the court below in the several cases.