

# OFFICE OF THE ATTORNEY GENERAL OF TEXAS
## AUSTIN

GROVER SELLERS
ATTORNEY GENERAL

Honorable Geo. H. Sheppard
Comptroller of Public Accounts
Austin 11, Texas

Dear Sir:

Opinion No. O-6159

Re: The measure of the amount
to be paid as a tax to the
State of Texas upon the oc-
cupation of producing oil
under the provisions of
Article 7057a, V. A. C. S.
should include the amount
paid as a premium for the
production of oil from so-
called "stripper wells".

Your letter of August 12 addressed to this office
relating to the captioned subject is set out in part as fol-
lows:

"Section 2, Article 7057a, which levies the
tax on oil produced within this State reads in part
as follows:

'The market value of oil, as that
term is used herein, shall be the actual
market value thereof, plus any bonus or
premiums, or other things of value paid
therefor or which such oil will reason-
ably bring, if produced in accordance
with the laws, rules and regulations of
the State of Texas.'

"This Department has recently received a num-
ber of inquiries from both the purchaser and the
producer of oil as to whether the proposed subsidy
payments which become effective August 1, will be
subject to the tax levied by Article 7057a.

NO COMMUNICATION IS TO BE CONSTRUED AS A DEPARTMENTAL OPINION UNLESS APPROVED BY THE ATTORNEY GENERAL OR FIRST ASSISTANT

"This is, therefore, to request your opinion as to whether or not the subsidy payment which will become operative and effective on August 1, is subject to the State tax levied by Section 2 of Article 7057a.

"* * *"

Article 7057a, V. A. C. S. was enacted by the 43rd Session of the Texas Legislature in 1933, amended by the 43rd Legislature at its first called session in 1933 and again amended at the regular session of the 44th Legislature in 1935. Section 2 of this Article was last amended by Acts 1941, 47th Legislature, page 269, Ch. 184, Art. 1, Sec. 1. This section of the article is concerned chiefly with the amount of the tax to be collected and the method by which such amount is to be measured. A part of Section 2, Article 7057a, V. A. C. S. is set out as follows:

"Sec. 2. (1) There is hereby levied an occupation tax on oil produced within this State of four and one hundred twenty-five thousandths (4.125) cents per barrel of forty-two (42) standard gallons. Said tax shall be computed upon the total barrels of oil produced or salvaged from the earth or waters of this State without any deductions and shall be based upon tank tables showing one hundred (100) per cent of production and exact measurements of contents. Provided, however, that the occupation tax herein levied on oil shall be four and one hundred twenty-five thousandths (4.125) per cent of the market value of said oil whenever the market value thereof is in excess of One Dollar ($1) per barrel of forty-two (42) standard gallons. The market value of oil, as that term is used herein, shall be the actual market value thereof, plus any bonus or premiums or other things of value paid therefor or which such oil will reasonably bring if produced in accordance with the laws, rules, and regulations of the State of Texas.

"(2) The tax hereby levied shall be a liability of the producer of oil and it shall be the duty of such producer to keep accurate records of all oil produced, making monthly reports under oath as hereinafter provided.

"(3) The purchaser of oil shall pay the tax on all oil purchased and deduct tax so paid from payment due producer or other interest holder, making

Honorable George H. Sheppard, page 3

> such payments so deducted to the Comptroller of
> Public Accounts by legal tender or cashier's check
> payable to the State Treasurer. Provided, that if
> oil produced is not sold during the month in which
> produced, then said producer shall pay the tax at
> the same rate and in the manner as if said oil were
> sold.
>
> «* * *»

As the first step in answering your question it is
necessary to ascertain the intention of the Legislature. This
the Legislature has made easy for us by the simplicity and
clarity of the language it has used in defining the term
"market value of oil". This definition as quoted in your let-
ter:

> "The market value of oil, as that term is
> used herein, shall be the actual market value
> thereof, plus any bonus or premiums, or other
> things of value paid therefor or which such oil
> will reasonably bring, if produced in accordance
> with the laws, rules and regulations of the State
> of Texas."

would seem to be as clear as legislative language could make
it. It states in such a manner as to leave no room for doubt
that the market price of the oil, the standard by which the
amount of the tax is to be calculated, should include any bonus
or premium or other thing of value which the production of the
oil brings into the hands of the producer thereof. We believe
that it may be said with assurance that it was the intention of
the Legislature that such a bonus or premium or subsidy as that
now being paid to producers of oil from stripper wells in the
State of Texas should be included in the market price for the
purpose of calculating the amount of the tax.

The publicity release from the Office of Price Admin-
istration released by the Office of War Information on Thursday,
July 13, 1944, which you attached to your opinion request, in
describing the plans by which these subsidies were to be paid
and distributed refers to the plan as "this premium payment
plan". In another paragraph of the said release, in speaking
of the amount to be paid under the plan, they are called "premium
payments". Nowhere in such release is the word "subsidy" used,
but it is obvious that the plan there outlined is a plan to pay
a subsidy, bonus, or bounty to encourage the production of oil
from minimum production or stripper wells. That part of the
article quoted in your letter and hereinabove, defining "market

Honorable George H. Sheppard, page 4


price of oil", uses both the words "bonus" and "premium" as
items to be included in the market price of oil.  In this con-
nection, however, it is proper to consider the word "subsidy",
the legal definition of which is:

> "A grant of funds or property from a govern-
> ment as of the state or municipal corporation to
> a private person or company to assist in the es-
> tablishment or support of an enterprise deemed
> advantageous to the public; a subvention".  60
> Corpus Juris 976,

as synonymous with the words "bonus" and "premium".

The amended act as set out above employs two bases by
which the amount of the tax to be paid is to be calculated.  The
first basis mentioned in the act is "by the barrel", and the act
provides that the sum of 4.125 cents per standard barrel of oil
produced shall be paid to the State of Texas by the producer,
and those having an interest in such production for each and
every barrel of oil produced so long as the market price of oil
shall be and remain less than $1.00 per standard barrel.  The
second basis provided by the act uses the market price of oil
as the standard for measurement and requires that 4.125 per
cent of the market price of the oil shall be paid to the State
of Texas as an occupation tax by the producer of such oil, and
those interested in such production, when the market price of
oil shall exceed $1.00 per standard barrel.

Where the first of these bases may be employed, it
is obvious that the payment or non-payment of a subsidy can have
no affect on the amount of the tax to be paid to the State of
Texas.  So long as the market price of the oil including the
subsidies does not rise above $1.00 per standard barrel, the
amount of the tax to be paid remains constant with or without
the payment of a subsidy or premium.  It is only where the market
price of the oil exceeds one dollar per barrel, or where because
of the payment of the subsidy the market price is caused to rise
above one dollar per barrel that it becomes necessary to consider
the market price of the oil in order to arrive at the amount of
tax to be paid.  When the market price of the oil is more than
one dollar, the legislative formula requiring the tax to be 4.125
per cent of the market price of the oil is used, and such formula
should be applied to the whole market price including the premiums
or subsidies if any.

It would be incorrect to conclude, however, that the
tax based on such a formula is actually a tax on the subsidy itself,

Honorable Geo. H. Sheppard, p. 5

even though the subsidy is included in arriving at the market price, and, even though the fact that the subsidy is thus included results in the producer's paying more tax than he would have paid had he not received such subsidy. This is a non-discriminatory tax levied by the Legislature upon all of the producers of oil in Texas which is applied alike to all engaged in the business of producing oil in accordance with a mathematical formula which makes the amount of the tax vary in direct ratio with the market price of the oil regardless of which producers or what producer receives such price. The percentage formula is constant and the same for each producer, while the market price for oil and the different elements going to make up that market price may change from day to day, from month to month, and, in a case like this where a differential is paid upon the less productive wells, such price and the elements making up the price may change from producer to producer. But a tax so laid and so measured is not a tax directed at or laid upon a federal subsidy. Nor is it a tax upon the purchaser of the oil, who, in paying the subsidies herein referred to, may or may not be a contractor with the Federal Government and may or may not be acting as a federal agent or instrumentality.

The view here expressed finds by analogy much support among the adjudicated decisions both in state and federal jurisdiction, a few of which are cited hereinafter. Thus we are brought to consider whether or not the State of Texas in collecting this tax may be said upon any grounds to be infringing upon any federal statutory or constitutional prohibition or limitation.

But first let us digress for a moment to examine briefly the nature of this form of taxation. The Legislature in enacting it called it an occupation tax. A Texas Court of Civil Appeals in State vs. Humphrey, 159 S.W. (2d) 163, held it to be an occupation tax. The Supreme Court of Texas in State vs. Humble Oil & Refining Company, 169 S.W. (2d) 707, while not stating specifically what kind of tax that court deemed it to be, referred to it repeatedly as a "gross production tax", and, indeed, the Legislature itself in Article 6032, V. A. C. S. mentioned the act as the "present gross receipts production tax on crude petroleum". It should be noted, however, that Article 6032 was enacted by the Legislature prior to the amendment of Article 7057a which gave to the act its present form. While the Supreme Court of the United States in Ballwise, et al vs. Sheppard, 299 U.S. 33, in holding this act to be constitutional,

Honorable Geo. H. Sheppard, p. 6

referred in different parts of its opinion to the tax as "an occupation tax", a "gross production tax", and an "excise tax". By whatever name the tax may be called, it is actually, in terms of common understanding, and by the weight of authority, a tax on the occupation of producing oil, a tax placed upon the business or the privilege of severing from the ground a natural resource of the State of Texas.

An exhaustive search for precedents bearing upon the authority of a state to collect tax, a part of the measurement of which is a federal subsidy similar to the one under discussion, uncovered no cases directly in point. The reason for this seems to be that the question is so novel that it has not been presented to any court in the form found here. The nearest parallel to such a subsidy is found in an act passed by the United States Congress on October 1, 1890, which provided that there should be paid to the producer of sugar of a certain grade from certain products within the United States a bounty of 2¢ per pound. The question whether these bounty provisions were constitutional was raised in the Supreme Court in Field vs. Clark, Ill. 12 S. Ct. 495, 143 U.S. 649, 36 L. Ed. 294. The Supreme Court refused to rule upon the constitutionality of these bounties, and the act was repealed by Congress two years later. Some state courts, however, have held similar sugar bounties to be unconstitutional under state constitutions as taking public money for a private use. This is not the proper place to raise a question as to the constitutionality of the subsidy payments here being considered. If, however, they should be held to be unconstitutional, they would then be taxable by the state upon the authority of the Supreme Court of Mississippi which held in Chapman vs. State, 179 Miss. 507, 176 So. 391, that payments made to a farmer under the afterwards-held-unconstitutional Agricultural Adjustment Act were proper objects for taxation by a Mississippi income tax law.

Any claim of statutory exemption from taxation of the premium payments would be founded on the authority of the Act of January 22, 1932, Ch. 8, Sec. 10, 47 Stat. 9 as amended by Act of June 10, 1941, Ch. 190, 55 Stat. 248, dealing with exemption of property of Reconstruction Finance Corporation from taxation. The most pertinent provisions of the Act are quoted:

"The corporation. . . shall be exempt from all taxation now or hereafter imposed by the United States . . . or by any state, county, municipality, or local taxing authority. . . ."

Honorable Geo. H. Sheppard, p. 7

"The exemptions provided for in the preceding
sentence with respect to taxation shall be construed
to be applicable. . . . with respect to. . . the
Defense Supplies Corporation. . . ."

Whether or not Congress had the power to exempt the prop-
erty of these corporations from taxation by the states, it was not
its intention to exempt persons or private corporations who might
benefit by receipt of money from payments made by such corpora-
tions. Such construction would, in the final analysis, impute to
Congress an intent to deprive the Federal Government of the power
to tax the property or income of private persons or corporations
insofar as they might consist of gain derived from such payments.

In cases where similar governmental payments or sub-
sidies have been made, both the Federal intermediate courts and
the Court of last resort have rejected arguments seeking to prove
analogous premiums or subsidies in the hands of the taxpayer ex-
empt: Lykes Bros. S. S. Co. Inc. vs. Comm. of Int. Revenue 126
F. 2d 725 (Steamship company mail contract in nature of a sub-
sidy); Baboquivari Cattle Co. vs. Comm. of Int. Revenue, 135 F.
2d 114 (Moneys received from Federal Government under Soil Conser-
vation and Domestic Allotment Act); Texas and Pacific Ry. Co. vs.
United States 286 U.S. 285 (amount paid to railroad by Federal
Government under Section 209 of the Transportation Act of 1920).

These cases are said to be not in conflict with, but
distinguishable from a contrary conclusion in Edwards vs. Cuba
Railroad Company 268 U.S. 628. The line of distinction is fine-
ly drawn and is based upon the definition of "income".

Similar to federal subsidies are moneys paid by Federal
Government under provisions of Act for Relief of Veterans of the
World War. By specific federal enactment these payments were
stated by Congress to be exempt from taxation. Nevertheless, the
Supreme Court of North Carolina in Martin vs. Guilford County, et
al, 158 S.E. 847, and in Lambert vs. Guilford County, 158 S.E. 849,
held that such exemption did not extend to the proceeds of said
moneys in the hands of the veterans and that when the money had
been paid and the plaintiff had acquired full and unrestricted title
and control thereof, and invested in another property, that prop-
erty was taxable by the county or state. These cases did not reach
a federal court.

In like manner, proceeds of war risk insurance by federal
enactment are specifically exempted from taxation. But In Re
Schaeffer 130 Misc. 436, 224 N.Y. Supp. 305, 55 A.L.R. 613 it was
held that provisions of said act relating to the exemption from

Honorable Geo. H. Sheppard, p. 8

taxation of insurance payable thereunder, do not exempt the amount paid to the estate of the insured from the State Transfer Tax, but the exemption applies only while such moneys are in the hands of the United States, and does not extend to cover such moneys after they have actually been paid to the beneficiary. It was further held that even if the exemption applied to the proceeds of insurance in the hands of the beneficiary, it would not exempt such proceeds from the transfer tax. The provision exempting property from taxation did not exempt the transfer thereof, upon the death of the owner, from the succession or transfer tax, the exemption applying to taxation of the property itself, and not to the excise or privilege taxes imposed upon the transfer thereof.

If the first purchasers of the oil under the premium payment plan, in paying these subsidies to the producer for which they are in turn compensated for the premium payments by Defense Supplies Corporation, an agency of the Federal Government, were considered thereby to become contractors with the Federal Government, they would not, according to the most recent ruling by the Supreme Court of the United States, because of such relationship, be freed from the effect of this form of taxation. The tax is not laid on the purchaser. It is on the producer. If he buys, the purchaser is required to pay the purchase price even though such payment might result in an increase in the cost of carrying out his federal contract.

The United States Supreme Court cases expounding this principle have an interesting history. In 1928 in Panhandle Oil Company vs. Mississippi, 277 U.S. 218, the Court in a majority opinion written by Mr. Justice Butler held that the Mississippi Occupation Tax on the sale of gasoline measured by the number of gallons sold could not be collected from a contractor who furnished gasoline to the United States Coast Guard and to a Veterans' Hospital because such a tax might place a burden upon a federal instrumentality by increasing the cost of the contract. In this case the Court found itself sharply divided 5 to 4. Mr. Justice Holmes wrote one of his great dissenting opinions in which he was joined by Mr. Justice Brandeis and Mr. Justice Stone; Mr. Justice McReynolds filed a separate dissenting opinion. Because the views expressed by Mr. Justice Holmes later became those of the Court, we quote here a part of his dissenting opinion:

"It seems to me that the state court was right. I should say plainly right, but for the effect of certain dicta of Chief Justice Marshall which culminated

in or rather were founded upon his oft-quoted prop-
osition that the power to tax is the power to des-
troy. . . The power to tax is not the power to des-
troy while this court sits. . . When the government
comes into a state to purchase, I do not perceive
why it should be entitled to stand differently from
any other purchaser. It avails itself of the machinery
furnished by the state, and I do not see why it should
not contribute in the same proportion that every other
purchaser contributes for the privileges that it uses.
It has no better or other right to use them than any
one else. The cost of maintaining the state that
makes the business possible is just as necessary an
element in the cost of production as labor or coal.
. . . I am not aware that the President, the members of
Congress, the Judiciary or, to come nearer to the
case in hand, the Coast Guard or the officials of the
Veterans' Hospital, because they are instrumentalities of
government and cannot function naked and unfed, hitherto
have been held entitled to have bills for food and
clothing cut down so far as their butchers and tailors
have been taxed on their sales; and I have not supposed
that the butchers and tailors could omit from their tax
returns all receipts from the large class of customers
to which I have referred. . . ."

On November 10, 1941, in Alabama vs. King and Boozer,
314 U.S. 1, 62 S. Ct. 43, the United States Supreme Court in a
unanimous opinion specifically overruled Panhandle vs. Mississippi,
supra, and another case based upon its authority and held:

(1)  "The constitutional immunity of the United
States from state taxation is not infringed by the
exaction of a sales tax, with which the seller is
chargeable but which he is required to collect from
a buyer, in respect to materials purchased by a con-
tractor with the United States on a cost-plus basis
for use in carrying out his contract, notwithstand-
ing the economic burden of the tax is borne by the
United States and notwithstanding that under the con-
tract, title to such materials passed to the United
States on shipment by the seller . . . and

(2)  "The Constitution of the United States un-
aided by congressional legislation, does not prohibit
nondiscriminatory state taxation of contractors with
the United States merely because the burden is passed
on economically, by the terms of the contract or

Honorable Geo. H. Sheppard, p. 10

otherwise, as part of the construction cost to the government."

Quoting from the opinion of the Court:

". . . participants in the present transaction enjoy only such tax immunity as is afforded by the Constitution itself. . So far as such a nondiscriminatory state tax upon the contractor enters into the cost of the materials to the government, that is but a normal incident of the organization within the same territory of two independent taxing sovereignties the asserted right of the one to be free of taxation by the other does not spell immunity from paying the added cost, attributable to the taxation of those who first apply to the government and who have been granted no tax immunity. So far as a different view has prevailed see Panhandle Oil Company vs. Mississippi and Graves vs. Texas Company, we think it no longer tenable. See Metcalf and Eddy vs. Mitchell 269 U.S. 514; Trinity Farm Construction Company vs. Grosjean 291 U.S. 466; James vs. Dravo Contracting Company 302 U.S. 134; Helvering vs. Gerhardt 304 U.S. 405; Graves vs. N. Y. 306 U.S. 466."

Closely analogous to this tax upon the business of producing oil in Texas are franchise taxes enacted by almost every state in the Union from domestic and foreign corporations for the privilege of doing business within their respective jurisdictions. Such franchise taxes are as a rule based upon a legislative formula just as the tax here under discussion is based upon a formula. Many of the formulas employed include within their standard of measurement upon which the tax is based, income from federal contracts, funds which are received from federal agencies or federal instrumentalities, earnings from federal copyrights or patents, and interest on federal tax-exempt bonds or obligations. There is a long line of Supreme Court decisions upholding these various forms of taxation and holding that such nondiscriminatory taxation plans which may include any or all of the above-enumerated federal sources of income within their taxable base do not place any prohibited burden upon the Federal Government and do not violate any actual or implied provision of the Federal Constitution.

Educational Films Corporation of America vs. Ward, 282 U.S. 379 was a case involving a franchise tax, one of the types hereinabove referred to, and in deciding it the Court laid down

Honorable Geo. H. Sheppard, p. 11

the following rules:

1. Assuming that federal property rights and income therefrom are immune from state taxation as instrumentalities of the Federal Government the tax here, insofar as measured by income from the copyright royalties is not void as a tax on federal instrumentalities.

2. The state power to tax corporate franchises and the immunity of federal instrumentalities from taxation, should be given such a practical construction as will not unduly restrict the power of the government imposing the tax, or the exercise of the functions of the government which may be affected by it.

3. There is a logical and practical distinction between the tax laid directly upon all of a class of government instrumentalities which the Constitution impliedly forbids, and a tax such as the present, which can in no case have any incidence unless the taxpayer enjoys a privilege which is a proper object of taxation . . . .

In arriving at the conclusion set out next above the Court wrote as follows:

"So far as it concerns the power of a state to impose a tax on corporate franchises, the problem has long ceased to be novel. While this Court since McCulloch vs. Maryland, 4 Wheat, 316, has consistently held that the instrumentalities of either government or the income derived from them, may not be made the direct object of taxation by the other, . . . it has held with like consistency that the privilege of exercising the corporate franchise is no less an appropriate object of taxation by one government merely because the corporate property or net income which is made the measure of the tax, may chance to include the obligations of the other or the income derived from them. The constitutional power of one government to reach this permissible object of taxation may not be curtailed because of the indirect effect which the tax may have upon the other.

"The precise question now presented was definitely answered in Flint vs. Stone-Tracy Company, 220 U.S. 107, which upheld a federal tax, levied upon a corporate franchise granted by a state, but measured by the entire corporate income including in that case income from tax-exempt municipal bonds. In reaching

Honorable Geo. H. Sheppard, p. 12

this conclusion, the Court reaffirmed the distinction, repeatedly made in earlier decisions, between a tax, invalid because laid directly on governmental instrumentalities or income derived from it, and an excise which is valid because imposed on corporate franchises, even though the corporate property or income which is the measure of the tax embraces tax-exempt securities or their income. See Society for Savings vs. Coite, 6 Wall. 594; Provident Institution vs. Mass., 6 Wall. 611; Hamilton Co. vs. Mass, 6 Wall 632.

"Upon a like principle other forms of excise tax have been upheld, although the statutory measure of the tax includes securities constitutionally immune from any form of direct taxation. A state inheritance or a legacy tax is valid, although measured by the value of United States bonds which are transmitted. Plummer vs. Coler, 178 U.S. 115. By parity of reasoning an inheritance tax may be levied by a state on a bequest to the United States, U.S. vs. Perkins, 163 U.S. 625 and by the United States on a bequest to a municipality. Snyder vs. Bettman, 190 U.S. 249. Similarly, state laws taxing to stockholders at full value stock in national banks, are upheld although the banks own tax-exempt United States bonds. Van Allen vs. Assessors, 3 Wall 573; Peo. vs. Commissioners, 4 Wall. 244.

"This Court, in drawing the line which defines the limits of the powers and immunities of state and national government, is not intent upon a mechanical application of the rule that government instrumentalities are immune from taxation, regardless of the consequences to the operation of the government. The necessity for marking those boundaries grows out of our constitutional system, under which both the Federal and State Government exercise their authority over one people within the territorial limits of the same state. The purpose is the preservation to each government, within its own sphere of the freedom to carry on those affairs committed to it by the Constitution without undue interference by the other. McCulloch vs. Maryland, supra; The Collector vs. Day, 11 Wall. 113, 125; Railroad Company vs. Peniston, 18 Wall. 5, 31; South Carolina vs.

United States, 199 U.S. 437; 461; Flint vs. Stone-Tracy Company, supra."

There is no denying that in some instances the decisions are conflicting. This is more true of earlier decisions than of the later ones. No area of absolute certainty is to be found on the border-line of conflict between the state and federal jurisdictions in matters of taxation.

However, the weight of authority, reinforced by the distinctly discernible recent trend of the Supreme Court to liberalize its viewpoint toward similar taxation plans, upholds the validity of laws levying and measuring taxes by the method used by the Legislature in its enactment of Article 7057a, V. A. C. S.

You are therefore advised that in our opinion:

1. The Legislature intended to include within the measurement standard upon which the tax is based such premium payments or subsidies as those described in your letter.

2. The state has the power to exact payment of taxes which include within their measurement formula these premium payments or subsidies.

3. In providing for such taxation, the state has not infringed upon federal statutory or constitutional prohibitions or limitations.

Yours very truly

ATTORNEY GENERAL OF TEXAS

By Robert T. Cherry
Assistant

RFC:BBH



APPROVED
OPINION
COMMITTEE
BY ___ CHAIRMAN