UNITED STATES of America, Plaintiff,

v.

**Trent Lee HAGEN, Defendant.**

**Crim. A. No. H–87–224.**

United States District Court,
S.D. Texas,
Houston Division.

April 27, 1989.

Richard Banks, Asst. U.S. Atty., Houston, Tex., for plaintiff.

Thomas S. Berg, Asst. Federal Public Defender, Houston, Tex., for defendant.

## OPINION ON SPECIAL ASSESSMENTS OF CRIMINALS

HUGHES, District Judge.

### 1. Introduction.

After conviction before the magistrate for a misdemeanor offense, the defendant appeals only to contest the imposition of the special assessment of $25. The assessment is defective because the statute authorizing it originated in the Senate rather than the House as required by the Constitution. The conviction and sentence will be undisturbed, but the assessment will be rescinded.

### 2. Statute.

Under the Victims of Crime Assistance Act of 1984, courts were required to impose special assessments on persons convicted of offenses against the United States. 18 U.S.C. § 3013 (1984). The assessment is $50 for each felony and $25 for each misdemeanor. This crook tax is wholly separate from the penalties under the statute describing this crime or the general criminal scheme. 18 U.S.C. § 1030(a)(6)(A), (c)(2)(A) (1988); 18 U.S.C. § 3551 (1988).

### 3. Questions.

The challenge presents two questions:

A. Is the special assessment a tax or penalty? To violate the origination clause, the special assessment first must fall within the class of revenue raising bills covered by it. U.S. Const. art. I, § 7, cl. 1.

B. If the assessment is a tax, where did the bill originate? If the statute is a revenue raising mechanism, the origination clause requires that the bill be introduced in the House not the Senate.

### 4. Legislative History.

In 1984, Senate Bill 2423 became the Victims of Crime Assistance Act, which is 18 U.S.C. § 3013. S. 2423, 98th Cong., 2d Sess. (1984). When this bill was introduced in the Senate, it was referred to the Committee on the Judiciary. During a committee hearing in May 1984, Senator John Heinz of Pennsylvania proposed an additional provision for the collection of an assessment. Senator Heinz explained the amendment:

> [T]he purpose of imposing nominal assessment fees is to generate needed income to offset the cost of the new programs authorized under S.B. 2423. Although substantial amounts will not result, these additional amounts will be helpful in financing the program and will constitute new income for the federal government.

*The Victims of Crime Assistance Act of 1984: Hearings on S. 2423 before the Senate Comm. on the Judiciary*, 98th Cong., 2d Sess. 21 (1984) (statement of Senator Heinz).

On May 10, 1984, the committee reported S. 2423 favorably, including the new section for special assessments. The Senate passed S. 2423 in August 1984, but it was never passed by the House. Later in that session, during the Senate's discussion of a House-passed bill, the Senate added the amended text of S. 2423 to House joint Resolution 648. H.R.J.Res. 648, 98th Cong., 2d Sess. (1984). The amended H.R.J.Res. 648 was passed by the Senate. The bill was referred to a conference committee, and it reported a version including the Senate's assessment section. Both houses passed the conference bill, and it was signed.

### 5. Revenue Raising.

Although the adopted version of S. 2423 uses the term special assessment, indicating a specific charge or tax to raise funds, the label alone does not always explicitly indicate the true purpose of the statute. The legislative history, however, indicates that the purpose of S. 2423 was to add new income for the federal government. Reliance on the expression of one proponent, like Senator Heinz, of a provision may also be misleading, but in this case no other purpose was discussed.

A bill that "may incidentally create revenue," like allowing the Park Service to charge admission to the Washington Monument, might not be a revenue bill constitutionally. 1 Story, *Constitution* § 880. Justice McKenna's puerile observation that

"[w]hatever taxes are imposed are but means to the purposes provided by the act" is true of all taxes; to exempt from the Constitution bills that contained expenditures and taxes would gut the origination clause by the expedient of including any nontax provision in every tax bill the Senate wants to initiate. *Millard v. Roberts*, 202 U.S. 429, 437, 26 S.Ct. 674, 675, 50 L.Ed. 1090, 1093 (1905).

More important, the language of the statute compels the conclusion that the imposition is taxation rather than deterrence or retribution. An informed, disinterested reading of the face of the statute discloses a tax on crooks and not a program of penalties. Put simply: "The best indicator of what statutory words mean is what they say." *Finnegan v. Matthews*, 641 F.2d 1340, 1344 (9th Cir.1980) (Goldberg).

The assessment could be considered a further punishment, but the assessment is a tax, not a part of the sentence, even though it was made at the time of the sentencing. The defendant's conviction happens to be the requisite event for the imposition of the tax, as the importation of goods is the event of imposition of custom duties; however, that does not make it part of the sentence. Neither its codification nor collection method keeps it from having the purpose and effect of a traditional revenue bill. *Contra United States v. Ramos*, 624 F.Supp. 970 (S.D.N.Y.1985).

6. *Origination Clause.*

Because the special assessment is a tax on crooks, the taxpayer has challenged the statute under the origination clause of the Constitution. It says:

All Bills for raising Revenue shall originate in the House of Representatives, but the Senate may propose or concur with Amendments as on other Bills.

U.S. Const., art. I, § 7, cl. 1.

The origination clause evolved from the compromise at the constitutional convention that allowed each state to be represented equally in the Senate. The compromise included the restriction that revenue measures originate only in the House. "Dr. Franklin, considered the two clauses, the originating of money bills, and the equality of votes in the Senate, as essentially connected by the compromise...." Madison's Notes (Aug. 9, 1787). Yates's notes reflect that Franklin was the author of the compromise. Yates's Notes (June 26, 1787).

The original plan was to restrict the Senate to approving or disapproving tax and appropriation bills from the House, with neither origination nor amendment in the Senate. This was the practice in the British Parliament between the Commons and Lords. Ultimately, the convention adopted the lesser restriction of allowing Senate amendment. The constitutions of eight of the thirteen states had some form of limit. Madison's Notes (Aug. 13, 1787) (quoting John Dickinson of Del.). Also, the origination clause gave the House a power particular to it to balance that given the Senate over treaties and appointments. *The Federalist* No. 66 (A. Hamilton).

Among the reasons discussed at the convention, the philosophical basis for the limitation most resonate politically today is Elbridge Gerry's statement that: "Taxation and representation are strongly associated in the minds of the people...." Madison's Notes (Aug. 13, 1787). The House appeared to be more directly and immediately representative of the people. The ratification of the 17th amendment requiring the direct election of Senators may have altered the original premise, but it clearly did not alter the origination clause itself.

Although the delegates, including Gouverneur Morris and James Madison, who thought that the provision was of no consequence may have been correct in their estimate, it was adopted. The origination clause represents, at the very least, a procedural restraint on the exercise of legislative power. As a structural limit, origination is part of a critically important pattern of restriction and allocation, along with separation of powers, enumerated powers, categorical prohibitions, presentment, and bicameralism, among others. "The history of liberty has largely been the history of observance of procedural safeguards." *McNabb v. United States*, 318 U.S. 332,

347, 63 S.Ct. 608, 616, 87 L.Ed. 819 (1943) (Frankfurter).

### 7. *Origination.*

The Senate initiated the special assessment bill. The special assessment provision was first introduced in the Senate Judiciary Committee, and the Senate first passed the bill. The Senate bill was never passed separately by the House, but when H.R.J.Res. 648 was being debated in the Senate, the Senate revenue provision was added to it. The House first considered the assessment when the conference committee reported the compromise bill containing it to both houses. Even the conference committee substitute passed the Senate before it passed the House.

### 8. *Amendment.*

The final question is whether the amendment to H.R.J.Res. 648 is constitutional as an amendment "as on other Bills," U.S.Const. art. I, § 7, cl. 1. The Senate has the power to amend a revenue bill initiated in the House, but even this power is limited. A Senate amendment to a House bill must be "not beyond the power of the Senate to propose." *Flint v. Stone Tracy Co.*, 220 U.S. 107, 143, 31 S.Ct. 342, 346, 55 L.Ed. 389 (1911). The part of the Senate amendment raising revenue modified no part of the House resolution. The House bill had nothing to do with a revenue raising mechanism, but only concerned other aspects of crime control; there was no revenue provision of the House resolution for the Senate to expand or contract by amendment. The Senate's *addition* of a revenue amendment to the House resolution was not a change to a House-generated tax proposal, and, therefore, it was outside of the origination clause's amendment exception.

### 9. *Political Question.*

The place where a bill originated, it has been suggested, is a political question, one that is unsuitable for judicial resolution because the court must look beyond the final engrossment of the bill into the workings of the Congress to ascertain whether the legislative branch followed the Constitution. *Texas Ass'n of Concerned Taxpayers, Inc. v. United States*, 772 F.2d 163, 167 (5th Cir.1985). The court of appeals said that the origination clause was satisfied by the certificate of the House clerk that the bill originated in the House; that reduces a constitutional mandate to an obligatory acceptance of demonstrably erroneous paperwork. An alternative was to permit Congress to define for itself which bills that extract money from people are revenue bills under the Constitution. To permit Congress to define "revenue" to exclude deliberate taxes is not deference; it is abdication. The reading that should be given the origination clause is that of its history, of its text, and of a disinterested party.

A tax statute that originates in the Senate is as void of authority as would be the confirmation of an ambassador by the House. The judiciary owes considerable deference to the legislature's political, policy choices where they are within the framework of the Constitution's grants and restrictions. When it fails to heed the limits on its own power, however, it must be checked, for there is no discretion in the legislature to suspend the Constitution at all, much less for its own aggrandizement. "Without that instrument, it is as powerless as any other association of men." *United States v. Guthrie*, 17 How. (58 U.S.) 284, 309, 15 L.Ed. 102 (1854).

The requirement of bicameralism would require the court to go behind the certificate of the presiding officers. In these instances the legislature is impeached by its own records. Indeed, it is these records that it expects the courts to employ in interpreting its acts. If the Congress should pass a law without reading it, that might parallel Justice Harlan's refusal to consider whether there were parts of an engrossed bill that did not appear in the committee reports. *Field v. Clark*, 143 U.S. 649, 12 S.Ct. 495, 36 L.Ed. 294 (1892). Much of the opinions that exalt tolerance are given to chatter about "coequal" branches and "inconvenience" to the public interest. First, although the branches are three and equal, the Constitution is supreme. Second, the administrative incon-

venience that would result from the invalidation of a major tax law, as in *Field* and *Texas A.C.T.*, should concern the courts, but to those in power the Constitution was meant to be a monumental inconvenience.

Courts are required occasionally to intrude into the working of the other branches, and they have been constitutionally obliged to impose the law on them from the beginning. From *Marbury v. Madison,* 1 Cranch 137, 2 L.Ed. 60 (1803), to *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), and *Powell v. McCormack,* 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed. 2d 491 (1969).

10. *Conclusion.*

History reveals that the Constitution was born of compromise. The compromises were on approach and technique because the framers were all republicans, holding in common the necessity of limiting government. "Most commonly the discussion of power centered on its essential characteristic of aggressiveness: its endlessly propulsive tendency to expand itself beyond legitimate boundaries." Bernard Bailyn, *The Ideological Origins of the American Revolution,* 56 (1967). The rule of law as a discipline of authority was the principle of our political heritage and conscience. *See,* A.E. Dick Howard, *The Road from Runnymede: Magna Carta and Constitutionalism in America* (1968).

Observance of specific provisions like the origination clause is crucial to continuing the protections provided in the Constitution. The framers recognized that the power over the purse had been extraordinarily important in Anglo–American history, and they bestowed this power on the House. The grant was restricted. Besides the limit that revenue bills be born in the House of Representatives, for instance, both houses are bound by the biennial limit on army appropriations.

Specific grants of power, prescription of methods, and categorical prohibitions of authority were not arranged casually; a deliberate but delicate and complex machine was designed to allow the necessary evil of government just enough power to preserve our community of individuals. Each procedural requirement in isolation may appear as an inconsequential and peculiar threat that impedes good and efficient government, but when all of these petty strings are viewed together, they form the fabric of our constitutional net over the menace of power. "The accretion of dangerous power does not come in a day. It does come, however slowly, from the generative force of unchecked disregard of the restrictions that fence in even the most disinterested assertion of authority." *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 594, 72 S.Ct. 863, 889, 96 L.Ed. 1153 (1952) (Frankfurter). Courts do Congress no honor when they blink before its errors.

The apparent nuisance of this little clause is, therefore, important to letter and logic of the supreme law. "The great purposes of the Constitution do not depend on the approval or convenience of those they restrain." *Everson v. Bd. of Educ.,* 330 U.S. 1, 28, 67 S.Ct. 504, 517, 91 L.Ed. 711 (1947) (Jackson). Whatever we might think of the wisdom of what lies there in the text, it is there, and as Chief Justice Warren said, "The provisions of the Constitution are not time-worn adages or hollow shibboleths. They are vital, living principles that authorize and limit government powers in our Nation. They are the rules of government." *Trop v. Dulles,* 356 U.S. 86, 103, 78 S.Ct. 590, 599, 2 L.Ed.2d 630 (1958).

Discerning the proper application of the monumental but indefinite clauses of the Constitution, like due process of law, may confuse thoughtful people, but the origination clause is no harder to apply than the requirement that the President must be thirty-five years old. The assessment will be rescinded.